Eleanor Lansburgh, Administratrix with the Will Annexed of the Estate of Lester Lansburgh, Petitioner, *v*. Commissioner of Internal Revenue, Respondent.

Irving Trust Company, as Trustee under Trust Indenture Dated December 28th, 1929, as Modified by Agreement Dated April 1st, 1933, with Lester Lansburgh, Deceased, Petitioner, *v*. Commissioner of Internal Revenue, Respondent.

Docket Nos. 81480, 84371.   Promulgated April 23, 1937.

*David Michelsohn, Esq., Edward R. Peckerman, Jr., Esq.*, and *R. B. H. Lyon, Esq.*, for the petitioners.
*Eugene G. Smith, Esq.*, for the respondent.

#### OPINION.

Disney: The above proceedings, consolidated by stipulation for trial and decision, are for the redetermination of the liability of Eleanor Lansburgh as administratrix of the estate of Lester Lansburgh, deceased, for a deficiency of $23,138.26 in estate tax asserted by the respondent against the estate of Lester Lansburgh, and the

liability of the Irving Trust Co. as transferee for said deficiency and undischarged returned estate tax of $6,614.02.

Lester Lansburgh died August 10, 1933, a resident of New York City, survived by his wife, Eleanor Lansburgh, and two minor daughters, living with their mother. His will was admitted to probate October 2, 1933; the executor named did not qualify; Eleanor Lansburgh qualified as administratrix with the will annexed, and letters testamentary were issued to her. The assets of the estate consisted of $716.18 cash in bank, $1,172.79 proceeds of insurance payable to the estate, and 2,064 shares of the capital stock of Lansburgh & Bro., Inc., a close, family-owned and controlled corporation operating a store in the District of Columbia. In addition $22,684.08 life insurance proceeds were paid to the widow and $332,745.66 proceeds of life insurance policies were paid to the Irving Trust Co. as trustee under a trust indenture made by Lester Lansburgh December 28, 1929, and by him modified April 1, 1933. Total debts and funeral and administration expenses against the estate were proved in the amount of $22,359.02, of which only $8,381.02 was paid and allowed by the administratrix. The proof varies from the figures set forth in the estate tax return. The estate, aside from the $1,888.97, being the total of cash in bank and life insurance money paid to the estate, was insufficient for payment of the debts of the estate.

The administratrix attempted to procure a loan on the security of the 2,064 shares of the capital stock of Lansburgh & Bro., Inc., in order to raise funds to pay the expenses and charges of the estate. She wrote a letter to a list of about 111 banks and insurance companies requesting a loan, but could obtain none. She attempted without success to get such a loan from all stockholders of Lansburgh & Bro., Inc. These facts were communicated to the collector of internal revenue for the third district of New York, and to the Commissioner of Internal Revenue. Attempt was also made to sell the shares to the other stockholders, also to various banks and insurance companies, but none of them would buy the shares or treat them as security. Section 215 of the Surrogate's Court Act of the State of New York provides in effect that an executor may petition the surrogate's court for advice and direction as to the propriety, price, manner, and time of sale of property; that notice of the application shall be given to all persons interested or directed by the surrogate to have notice; that the surrogate may hear the application and witnesses, and give such advice and direction as seem to him for the best interests of the parties. The administratrix filed such a petition before the Surrogate's Court of New York County on May 23, 1934, for leave to sell the capital stock of Lansburgh & Bro., Inc., or so

much thereof as might be necessary to pay the expenses and other obligations of the estate. Notice of hearing upon the application was directed to all parties interested, and served upon the collector of internal revenue for the second district of New York, and upon the Commissioner of Internal Revenue. At the hearing, the United States was represented by "Mr. Roberts" of the office of the Honorable Martin Conboy, United States Attorney. Notice was also published in a newspaper published in Washington, D. C. Upon such hearing the surrogate made an order granting the petition of the administratrix to sell the shares of stock, the order being dated October 11, 1934. The order required that the notice of the time and place of sale be published five days in the Washington Evening Star and the New York World Telegram, and that notice be given by mail to the collector of internal revenue for the second district of New York, and the United States Government, and such notice was given.

The shares of stock were sold on October 24, 1934, pursuant to the terms of the order. The sale was at public auction in the city of New York. Eleanor Lansburgh was the only one who appeared to bid at the sale. Representatives of the State Tax Commission of New York were present, but did not participate in the sale. Eleanor Lansburgh individually purchased the shares of stock for $3,500. The auctioneer's report recites the purchase by Eleanor Lansburgh for $3,500 and that "the deposit and cash was waived by agreement." The auctioneer made report of the sale to the surrogate. The surrogate had appointed a special guardian and referee to represent the interests of the decedent's minor children. The guardian and referee made a report approving the sale. After the consummation of the sale, a New York estate tax return, and a Federal estate tax return were filed with the respective taxing authorities in which the stock was reported at a valution of $3,500. That value was accepted by the State Tax Commission of New York.

The cash assets of the estate, including the proceeds received from the sale of the shares, were insufficient to pay the debts and administration expenses, and were insufficient to pay any tax whatever. At the time Lester Lansburgh entered into the trust indenture dated December 28, 1929, he was vice president and general manager of S. M. Greer & Co., receiving a salary of $75,000 a year, and had other income of from $20,000 to $25,000 per year. He had no liabilities. He was solvent on December 28, 1929. The record is silent as to whether there were any other sales of the stock near the time of Lester Lansburgh's death.

In connection with the petition to the Surrogate's Court for permission to sell the stock, it was represented to the surrogate that Eleanor Lansburgh was ready and willing to pay $3,500 for the

stock, the petition so stating; also that the sale was necessary to close the estate. The petition further stated that dividends had not been paid by Lansburgh & Bro., Inc., during the last two years. The petition also submitted an undertaking to create a trust of all of said shares of stock without any obligation whatever to the petitioner, Eleanor Lansburgh, and to have the stock administered by the trustee to be named either by the surrogate or by the petitioner in accordance with the terms of the last will of Lester Lansburgh. The petition also recited that the last will and testament of Lester Lansburgh directed, and said last will did direct, that after the payment of debts, funeral expenses, taxes, and $10,000 to each of the children, the rest of the estate (except automobiles, pictures, silverware, household goods, furniture and furnishings, jewelry, and personal effects, which were bequeathed to the wife) was placed in the hands of a trustee with directions to pay one-half of the income of the estate to the wife and the balance to the children, to be distributed equally between the daughters. The surrogate's order provided that no bids should be received for a sum less than $3,500. The report filed by the special guardian states that it is impossible to wind up the estate unless the stock is disposed of; that decedent's estate was divided by his will into two parts, the first for the benefit of the wife and the other half for the benefit of the two children; and that, since the stock is the only asset of the estate, "the best that the children can ever hope is to participate in the shares of stock, irrespective of their value." The special guardian's report also states:

The widow asks for permission to sell this stock for $3,500.00. She states in writing to the Special Guardian herein, that *in the event she shall purchase these shares of stock, at such price as she may bid, she will turn over to the infants the said stock as an absolute gift under such further trust terms and conditions as the surrogate may require.* * * *

Later in the report the special guardian states: "If the mother had not agreed to make a gift of the stock to the children, the Special Guardian would object to the sale." The special guardian attaches to his report a letter directed to him under date of September 21, 1934, by Eleanor Lansburgh, in which she states that in the event the surrogate shall direct a sale of the stock, and she should purchase the stock, that she will turn over to her daughters, Louise Lansburgh and Jane Lansburgh, infants, said stock as an absolute gift, under such further trust terms and conditions as the surrogate may require, and that this is to be deemed a representation on her part.

The special guardian's report further states that the stock shows a book value as of January 27, 1934, of about $130 per share; that it is not worth that much, but it is clearly worth more than $1.20 a share, at which price it is sought to sell the stock; that it has no present market value; that it is doubtful whether the stock is

worth the book value as fixed by the balance sheet of Lansburgh & Bro., Inc.; that he as special guardian thinks the true value of the stock is considerably less than the book value, but how much, he is unable to say, but that the fact remains that this stock must be disposed of in order that the estate be closed; that no dividends are being paid. The balance sheet of Lansburgh & Bro., Inc., attached to the special guardian's report states the amount of surplus on January 28, 1933, "Less Div. 2/5/33: $75,000.00."

When the sale was finally approved, Eleanor Lansburgh had already made the provision for the children in connection with the sale, the Guaranty Trust Co. of New York being the trustee named in the trust which Eleanor Lansburgh established. The stock was not delivered to the Guaranty Trust Co. of New York, but was held by the United States Fidelity & Guaranty Co. jointly with Eleanor Lansburgh, that company having made her bond in the amount of $160,000. The bonding company for the year preceding the trial had not made a charge for premium, because of statement by the administratrix and her counsel that the estate is insolvent, and for that reason, and for reasons of expense, no proceedings have been filed to reduce the bond. At the time of sale Lansburgh & Bro., Inc., was a going concern, had been for many years, operating a department store in the city of Washington, and the store is still running.

For the year ending June 30, 1933, Lansburgh & Bro., Inc., by Sol Lansburgh, president, on August 18, 1933, executed a return of capital stock tax, showing shares of stock to be 30,000 common of par value of $100, total $3,000,000, with a surplus of $785,532.25, and valued the 30,000 shares of stock as of June 30, 1933, at $3,125,433.73, being $104.18 per share. This capital stock tax return was sworn to by the president and treasurer of Lansburgh & Bro., Inc., and filed with the Treasury Department of the United States, and a tax of $1 per $1,000 on the value of the capital stock was paid in the sum of $3,125. Profits, dividends paid, and net sales of Lansburgh & Bro., Inc., for the years ended on the following dates were as follows:

|  | Profits for year | Dividends paid | Net sales |
|---|---|---|---|
| Jan. 31, 1930 | $293,192.29 | $180,000 | $5,709,910.23 |
| Jan. 31, 1931 | 276,588.86 | 180,000 | 5,816,909.85 |
| Jan. 31, 1932 | 209,307.53 | 180,000 | 5,562,903.88 |
| Jan. 28, 1933 | 69,133.24 | 165,000 | 4,666,397.66 |
| Jan. 27, 1934 | 28,411.60 | 75,000 | 4,412,898.43 |
| Jan. 31, 1935 | 195,955.14 | 60,000 | 5,346,098.00 |

The petitioners urge (1) that, the stock having been sold at public auction pursuant to order of the Surrogate's Court of the County of New York, the probate court having jurisdiction, the amount realized upon such sale was the "fair market value" of the shares; (2) that

where the debts and funeral and administration expenses of decedent and his estate exceed the amount realized by the administratrix in liquidating the assets, and insurance proceeds paid to beneficiaries other than the estate were included in the gross estate, the entire amount of the debts and funeral and administration expenses are deductible from the gross estate in determining the amount of the net estate; (3) that it was not the intent of Congress to permit the entire amount of the estate tax to be collected from one of the beneficiaries of insurance where the gross estate consisted in part of assets and in part of insurance proceeds in excess of $40,000, and where the debts and funeral and administration expenses exceeded the amount of the assets which came into the hands of the administratrix; (4) that it is contrary to the Fifth Amendment of the Constitution of the United States to collect the entire estate tax from one of the beneficiaries of insurance under the conditions above described under petitioners' third contention.

The taxability of the proceeds of insurance in the hands of the Irving Trust Co. is conceded; also, that, if the deficiency is sustained, a share thereof, proportioned in the same ratio that the insurance proceeds bear to the estate itself, should be borne by the transferee, Irving Trust Co., but petitioners contend that in any case the entire tax should not be borne by the Irving Trust Co.

The prime question is, of course, as to whether $3,500, the amount paid by Eleanor Lansburgh at the surrogate's sale for the stock of Lansburgh & Bro., Inc., is the value thereof under the statute, section 302 (a) of the Revenue Act of 1926.[1] The act, of course, merely refers to "the value of the gross estate" and "including the value at the time of his death." Article 13 (1) of Regulations 80 specifies that "the value" is "the fair market value", and both the courts and this Board have apparently interpreted the term as meaning "fair market value." *Ithaca Trust Co.* v. *United States*, 279 U. S. 151; *Laird* v. *Commissioner*, 85 Fed. (2d) 598; affirming 29 B. T. A. 196; *Frank J. Kier et al., Executors*, 28 B. T. A. 633. See also *Cecil H. Gamble, Executor*, 33 B. T. A. 94, 99. Both parties seem to have briefed the case upon the assumption of identity in meaning of the two terms. We therefore assume, for the purpose of this case, that "value" is in this matter equivalent to "fair market value." What then was the fair market value of the shares here at the time of the death of Lester Lansburgh? Is it defined and determined by the probate sale, made through the Surrogate's Court in New York,

---

[1] SEC. 302. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

(a) To the extent of the interest therein of the decedent at the time of his death. .

as argued by petitioners? The sale is, of course, competent evidence, but is it the sole criterion by which to judge? Lester Lansburgh died on August 10, 1933. This is the date as of which the fair market value of the stock in question is to be determined. The probate sale was made on October 24, 1934, more than a year later. Is the price of such sale the determining factor here?

*Heiner* v. *Crosby*, 24 Fed. (2d) 191, says:

* * * Sales made at a particular time and place may be significant, but the price paid is not necessarily decisive of fair market price or value. The fact of sales, in itself, and without regard to the circumstances under which the sales were made, does not conclusively establish either statutory fair market price or value. Sales made under peculiar and unusual circumstances, such as sales of small lots, forced sales, and sales in a restricted market may neither signify a fair market price or value, nor serve as the basis on which to determine the amount of gain derived from the sale. In such cases resort must be had to evidence to determine "fair value." * * *

In *Phillips* v. *United States*, 12 Fed. (2d) 598, the court says:

* * * The law of the case seems perfectly plain. It is well settled that the fair market price or value of the property as of March 1, 1913, is a question of fact under all the circumstances of the case. No method of determining this value can be stated which will adequately meet all circumstances. The stock sales made from time to time are to be considered together with the nature and extent of the sales, and the circumstances under which they were made; hence forced sales, or sales of small lots, may often be no real indication of the value. The test is the fair market value. This may be defined to be the value of the property in money as between one who wishes to purchase and one who wishes to sell; the price at which a seller willing to sell at a fair price, and a buyer willing to buy at a fair price, both having reasonable knowledge of the facts. * * *

Of course the statute being construed in the above cases is not the same as here involved, but there is no discernible distinction in principle. In *Andrew B. C. Dohrmann*, 19 B. T. A. 507, 513, we approved the language just above quoted from *Phillips* v. *United States*, in construing section 202 (b) of the Revenue Act of 1918 as to fair market value of property received in exchange, and we said:

We think it is well settled that whether property at a given date has a fair market value or not is a question of fact to be determined from all of the evidence introduced and admitted in each individual case; that no set rule or formula can be employed; and that in weighing and sifting the evidence the fact to be found, if it exists, is the cash price at which a seller willing but not compelled to sell and a buyer willing but not compelled to buy, both having reasonable knowledge of all the material circumstances, will trade.

In *Dunn & Baker, Inc.*, 30 B. T. A. 663, 667, we applied the same principle and quoted a portion of the same language in referring to fair market value with respect to which depletion was claimed.

· These and other cases convince us that the surrogate's sale in the Lester Lansburgh case is only one of the circumstances to be taken

into consideration in arriving at fair market value. Under Regulations 80, article 13 (3), the value of the stock of a close corporation is to be "determined on the basis of the company's net worth, earning power, and dividend-paying capacity, and all other relevant factors bearing upon the value of the stock." Moreover, it is at least doubtful in the instant proceeding whether the buyer and seller herein can be described in the language of *Phillips* v. *United States, supra,* as "both having reasonable knowledge of the facts"; for we can not but notice the fact that both the administratrix and the special guardian represented to the surrogate that the stock to be sold was not paying dividends, whereas in truth it was and had been paying dividends regularly in an amount each year from 1930 to 1935, inclusive, greater than the amount at which the stock was sold at the surrogate's sale. The stock sold for $1.69 per share. The capital stock of Lansburgh & Bro., Inc., was 30,000 shares. The yearly dividends hereinabove enumerated in gross show that a $6 dividend was paid in each of the years 1930, 1931, and 1932, a dividend of $5.50 per share in 1933, of $2.50 per share in 1934, and of $2 in 1935. The Surrogate's Court was, therefore, misinformed on this point of dividends paid, which is obviously one of the most important facts in determining value of stock. This situation serves to cast some doubt upon the bona fides of the sale, upon which petitioners heavily rest. The statements were made either ignorantly or intentionally. The sale either lacked bona fides or the seller and buyer did not have "reasonable knowledge of the facts." This, together with a consideration of all the facts, including the fact that the guardian and the wife and executrix represented to the surrogate that if she purchased the stock she would turn it over to the daughters of decedent as an absolute gift, the fact that the special guardian would have objected to the sale if the mother had not agreed to make such gift, the fact that the sale was more than a year after death, and the fact that both the executrix and the special guardian represented to the surrogate that the stock must be sold in order to close the estate, indicates to us that this sale, in spite of the fact that it was at auction, and that notice was given, was not a free and voluntary sale of the unrestricted nature that is required to furnish a dependable indication of fair market value at time of death. Certainly we can not give such a sale determining effect here, and we therefore proceed to consider it with the other evidence as to value.

The fact that there are no sales on the market does not prove that there is no market value, under many cases. Both under the regulations above referred to and in logic, we are required to include in our consideration the other circumstances including those as to intrinsic value. But when we do this, we are met by the fact not only that the stock paid regularly the dividends hereinabove

referred to, but that the stock had value, in terms of its interest in the assets of the corporation, of more than $100 per share at the time of sale; and that the solemn sworn statement of the president and treasurer of the company gave the stock the value of $104.18 per share as of June 30, 1933. This affidavit was sworn to eight days after the death of Lester Lansburgh, more than a year before the sale. The valuation set by the Commissioner approximates the valuation set by the corporate officers. We must and do conclude and hold that the petitioner has not overcome the presumption of the correctness of the Commissioner's determination as to the value of this stock being $100 per share, and on this issue we sustain the Commissioner.

(2) Petitioners' second contention is that the deductions from gross estate should include all lawful debts and funeral and administration expenses, regardless of amount of assets in the hands of administratrix. This question has been definitely settled in favor of petitioners' contention by *Mary Q. Hallock et al., Trustees*, 34 B. T. A. 575; *Commissioner* v. *Strauss*, 77 Fed. (2d) 401; *Union Guardian Trust Co., Administrator*, 32 B. T. A. 996; *Edna F. Hays et al., Executors*, 34 B. T. A. 808; *Edith M. O'Donnell*, 35 B. T. A. 251. We sustain the petitioners with respect to this issue to the extent of the $22,359.02 expenses of administration and debts of the estate and deceased, as shown by the evidence.

(3), (4). Petitioners' third and fourth contentions can be considered together. Succinctly stated, the petitioners argue that it was not the intent of Congress, and if there was such intent, it is contrary to the Fifth Amendment to the Constitution of the United States, to collect the entire amount of the tax herein from one of the beneficiaries of life insurance (in excess of $40,000) included in the gross estate, there being two beneficiaries of such insurance. There is no issue between the parties as to the taxability of the insurance. Petitioners merely contend that a particular beneficiary, such as the Irving Trust Co. herein, should not be required to pay, of the tax assessed, more than a part proportioned in the ratio which the insurance proceeds bear to the estate. They argue that the language of section 315 (b) (2) of the Revenue Act of 1926 bears out their contention, stressing the thought that the expressions "the tax in respect thereto" and "such tax" refer only to tax upon insurance mentioned in that subsection, and say that therefore the tax is proportionate to and limited to, such insurance. It is of course limited to the insurance received, but is it proportioned according to the proportion of estate and insurance received by the particular beneficiary?

In *Edna F. Hays et al., Executors, supra* (815), we considered a contention that a beneficiary of life insurance was not a "transferee" under section 316 (e) of the 1926 Act. We quoted the language

of the Conference Report on the Revenue Bill of 1926, which specifically showed that a beneficiary of an insurance contract was intended to be covered by the term "transferee"; and we therefore concluded and held that the beneficiaries of life insurance in that case were "transferees and are liable as such for the amount of the deficiency." There is no suggestion of liability only proportionate to the estate. The transferees are simply liable for the deficiency. By the inclusion of insurance beneficiary in the term "transferee", this decision affects and brings the provisions of sections 314 and 315 under the effect of section 316, so far as affecting insurance beneficiaries. From this it follows that the liability of an insurance beneficiary, as such transferee, shall be assessed, collected, and paid in the same manner as the deficiency, and the liability of a transferee, in turn, is shown to be "in respect of the tax"—not in respect of any proportion of the tax. We think therefore that any insurance beneficiary is liable for the entire deficiency. This is consonant with the language of section 314 (b), providing for contribution in favor of "any person other than the executor in his capacity as such" who pays "the tax or any part thereof." This language plainly includes the beneficiary of insurance. If he had been liable, as petitioners contend, only for his proportionate share he would need no right of contribution against others whom his payment had benefited (other than the estate). We believe that the statute plainly indicates intent to permit the Commissioner to collect the entire deficiency from any transferee, leaving the matter of proportionate liability as one for contribution between the several transferees. It is true that the language in section 315 (b) (2) is not entirely clear, but sound principles of statutory construction require us to consider that language in connection with the remainder of the act. So considering it, we reach the above conclusion.

Moreover, it is well settled that the liability of transferees is several, that the whole deficiency may be collected from one transferee, and that without joining others regard may not be given as to what is the pro rata share of a particular transferee. *Phillips* v. *Commissioner*, 283 U. S. 589. To the same effect are *McDonald* v. *Commissioner*, 52 Fed. (2d) 920, and *Fairless* v. *Commissioner*, 67 Fed. (2d) 475. In *Phillips* v. *Commissioner*, *supra*, the Supreme Court also decided definitely in favor of the constitutionality of the liability of transferees on grounds which we think cover the present contention. Although the above cases involve section 280 (a) (1) of the 1926 Act, the principles involved are the same; and in *Baumgartner* v. *Commissioner*, 51 Fed. (2d) 472; certiorari denied, 284 U. S. 674, following *Phillips* v. *Commissioner*, *supra*, the constitutionality of section 316 of the 1926 Act was sustained. The same reasoning which sustains the constitutionality of the liability of

938

transferee for the deficiency of transferor, plainly sustains his liability for the whole thereof as against a desire for apportionment thereof, as herein contended for. We having held that the insurance beneficiary is a transferee and that he is as such liable for the entire deficiency to the extent, of course, of the transferred assets in his possession, it follows that petitioners' plea as to Congressional intent and unconstitutionality must be, and the same is, denied, and it is held both that the act provides for several liability of the Irving Trust Co. as transferee, and that the provision is constitutional.

> *Decision accordingly will be entered under Rule 50 in both docket numbers.*