Estate of Katharine H. Daily, Deceased, Marshall & Ilsley Bank, Administrator with the Will Annexed of the Estate of Katharine H. Daily, Deceased v. Commissioner.
Estate of Katharine H. Daily v. Commissioner
Docket No. 8655.
United States Tax Court
1947 Tax Ct. Memo LEXIS 318; 6 T.C.M. (CCH) 114; T.C.M. (RIA) 47025; February 7, 1947
*318 Raymond T. Zillmer, Esq., for the petitioner. Jackson L. Boughner, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves a deficiency of $1,490.05 in estate tax. The issues are the value on July 23, 1941, of 350 shares of stock of the Harley-Davidson Motor Co. and whether petitioner may deduct from gross estate an additional amount for attorneys' and administrator's fees. Findings of Fact The petitioner is the administrator of the estate of Katharine H. Daily, who died on July 23, 1941, owning 350 shares of common stock of the Harley-Davidson Motor Co., a Wisconsin corporation. The estate tax return was filed with the collector for the district of Wisconsin. The petitioner elected to value the property of the estate as of the date of death of the decedent. The Harley-Davidson Motor Co., hereinafter sometimes referred to as the corporation, was organized in 1903 by three Davidsons and one Harley. On July 23, 1941, it was engaged exclusively in the manufacture of motorcycles and their accessories. Its capital stock at that time consisted of 34,597.13 shares of common stock, each of a part value of $100, *319 26,656.18 shares, or 77 per cent of which was owned by the survivor of the organizers of the corporation and descendants of the other incorporators. Members of the Harley and Davidson families have at all times constituted a majority of the board of directors of the corporation. Minority stockholders on the board of directors were in harmony with the Harley-Davidson interests. On July 23, 1941, all of the corporation's stock was owned by 55 individuals, one estate and ten trusts. It is not and was not then listed on any stock exchange. The last sale of the stock was in 1935, when 400 shares were sold for $85 a share. Of the dozens of companies engaged in the manufacture of motorcycles years ago, only two remained in 1941 - Harley-Davidson Motor Co. and the Indian Motocycle Co. The motorcycle industry as a whole reached its peak a good many years prior to 1941. In 1920 the corporation sold 28,189 motorcycles. Thereafter its sales to 1931 ranged from a low of 10,202 units in 1921 to a high of 23,354 in 1926. The corporation's sales of motorcycles from 1931 to 1941, inclusive, were as follows: Year
Motorcycles
1931
10,488
1932
5,158
1933
4,526
1934
8,739
1935
8,923
1936
10,417
1937
12,518
1938
8,177
1939
8,355
1940
10,855
1941
18,428
*320 In 1941 the corporation manufactured from 60 to 70 per cent of the motorcycles produced in the United States. There are three so-called principal fields using motorcycles, classified respectively as the sport, police and commercial, for delivery purposes. About 60 per cent of the total sales are to members of the first group, who, in general, consist of unmarried young men in the low income brackets and sales to them are affected by depressions. There was no increase in such sales from 1938 to 1941. Sales of motorcycles for police duty passed their peak prior to 1941, due, primarily, to the preference in state and county police organizations, for automobiles, which can be equipped with two-way radios, whereas a motorcycle can not be equipped with more than a one-way set. Motorized police, as a class, prefer to perform their duties in an automobile, and the preference was a factor the corporation had to contend with in its efforts to maintain its quantity of sales in the police field. Police sales of motorcycles from 1925 to 1942, were, as follows: Year
Motorcycles
1925
2,336
1926
1,892
1927
2,462
1928
2,481
1929
2,550
1930
2,413
1931
2,224
1932
1,795
1933
867
1934
881
1935
1,554
1936
1,282
1937
1,691
1938
1,519
1939
1,329
1940
1,139
1941
1,656
*321 On July 23, 1941, it appeared that there would be a further decline in sales of motorcycles for police duty. Automobiles virtually replaced motorcycles many years ago, as a means of transportation. The trend in the sale of motorcycles for delivery purposes was downward from 1930 to 1941. The outlook on July 23, 1941, for the sale of motorcycles in the United States was fair. At that time it appeared that the corporation would neyer have to cease business on account of lack of buyers of its product. The export sales of motorcycles by the corporation for the years 1929 to 1941 were as follows: Year
Motorcycles
Year
Motorcycles
1929
11,324
1935
2,407
1930
7,664
1936
2,455
1931
3,814
1937
1,973
1932
2,137
1938
1,962
1933
1,023
1939
1,528
1934
85
1940
1,581
1941
6,445
The loss of export sales after 1930 was due, in general, to production of light type, cheaper machines in England and Germany, tariff walls and inability of dealers to obtain dollars to finance purchases. The increase in export sales in 1941 was due to the war. War business of the corporation commenced in 1939, during which the United States and foreign governments *322 ordered a total of 1,200 motorcycles. In 1940 they ordered 1,850 motorcycles and in 1941 12,600 machines. At the same time substantial contracts were received for replacement parts. In July 1941 the corporation realized that jeeps, then in an experimental stage, might ultimately replace a large quantity of motorcycles for military purposes. Registrations of motorcycles in the United States ranged from 234,954 in 1920 to 100,364 in 1933. Thereafter, registrations were: Year
Registration
Year
Registration
1934
98,882
1938
113,182
1935
100,756
1939
118,323
1936
98,401
1940
127,240
1937
100,320
Automobile and truck registrations in the United States increased from 9,231,941 in 1920 to 26,227,276 in 1935, and thereafter from 28,165,550 in 1936 to 34,383,167 in 1941. The corporation's plant consisted of two six-story buildings separated by a street and connected by a shipping platform. The original buildings were enlarged as the corporation expanded. The plant was not a modern or efficient one. The salaries paid to officers of the corporation in 1938, 1939 and 1940, were as follows: 1938
1939
1940
President
$7,500
$7,500
$7,500
Vice president
3,757
4,063
4,400
Secretary
7,500
7,500
7,500
Treasurer
7,500
7,500
7,500
Ass't secretary and treas-
urer
4,668
4,980
5,080
Secretary of Kilbourn Fi-
nance Corp., a wholly-
owned affiliate
4,110
4,320
4,500
*323 The net sales, net income, earnings per share and dividends paid and dividends paid per share for the years 1936 to 1941 of the corporation and its subsidiary, were as follows: Year ending
Earnings
Dividends
Dividends
September 30
Net Sales
Net Income
Per Share
Paid
Per Share
1936
$4,200,794.55
$ 382,374.37
$11.05
$345,971.30
$10.00
1937
5,209,570.78
599,343.48
17.32
484,359.82
14.00
1938
4,105,988.70
320,129.79
9.25
380,568.43
11.00
1939
4,307,774.89
409,022.27
11.82
415,165.56
12.00
1940
5,296,743.22
770,472.52
22.27
415,165.56
12.00
1941
9,422,553.38
1,007,568.72
29.12
415,165.56
12.00
The consolidated balance sheets of the corporation and Kilbourn Finance Corporation on September 30, 1940, and September 30, 1941, per books, were as follows: Assets
9/30/40
9/30/41
Cash on hand and in banks
$ 748,057.37
$ 675,188.77
United States Government Securities at cost
1,130,205.61
1,727,984.16
Notes and Accounts Receivable - net
735,190.98
1,399,162.90
Accrued Interest and Sundry Debtors
20,351.11
11,670.48
Inventories
1,710,335.47
2,623,075.34
Due from officers and employees
2,215.94
1,336.84
Advances to Dealers - net
16,801.37
4,964.50
Other assets - Deposits in Canadian Banks
29,176.38
30,487.88
Plant Properties - net
1,009,751.65
1,237,778.17
Deferred Charges
69,781.42
93,180.12
Total Assets
$5,471,867.30
$7,804,829.16
Liabilities and Capital
Current liabilities
$ 736,428.74
$2,388,710.24
Unearned Interest and Service Charges
47,703.69
43,644.57
Reserve for Parcel Post Insurance
3,000.00
3,000.00
Reserve for Contingencies
7,663.68
100,000.00
Capital Stock - 34,597.13 shares
3,459,713.00
3,459,713.00
Capital Surplus
6,000.00
6,000.00
Earned Surplus
1,211,358.19
1,803,761.35
Total Liabilities and Capital
$5,471,867.30
$7,804,829.16
*324 The United States Government securities entered in the balance sheets at cost had a value of $1,166,585.94 on September 30, 1940, and $1,772,394.15 on September 30, 1941. At the close of its fiscal years 1940 and 1941 the corporation had fully depreciated assets of a total cost of $1,760,000 still in service. Depreciation disallowed by revenue agents under Treasury Decision 4422, based upon the remaining value of the assets on hand September 30, 1933, resulted in an increase of net worth of the corporation on September 30, 1940, for income tax purposes, from $4,677,071.19 to $5,026,335.63. The 350 shares of common stock of the corporation in the estate of the decedent were returned by the petitioner for estate tax purposes at a value of $75 a share, or $26,250. In his determination of the deficiency the respondent increased the value of the stock to $150 a share. The stock had a value on July 23, 1941, for estate tax purposes of $110 a share. The petitioner, in its estate tax return, deducted executor's commission of $642.78 and attorneys' fees of $1,200. The Commissioner in determining the deficiency allowed $850 and $1,225, respectively, with the statement that the latter *325 amounts had been allowed by the court and paid. Opinion The petitioner, upon brief, contends that the value of the stock on the date of death of the decedent was somewhere between $75 a share, the value at which the stock was returned for estate tax purposes, and $90.35 a share as testified to by its expert witness. The respondent's position, in general, is that the petitioner has failed to show error in his valuation of $150 a share. The stock of the corporation was closely held and was not listed on any stock exchange. The only sale of record was made in 1935, a transaction too remote from July 23, 1941, to be a decisive factor. The petitioner's valuation witness expressed as his opinion that the stock had a value on July 23, 1941, of $90.35 a share. The following method, briefly stated, was used by him in arriving at his result: He determined that the average yearly earnings of the Indian Motocycle Co. for the period from 1936 to 1940, inclusive, were 6.55 times the market value of $11 a share for the stock on the basic date; that on such basis the value on that date of stock of the corporation here involved would be $93.93 (6.55 times average earnings of $14.34 a share *326 for the same period), without any deduction for underwriting, but as the corporation was the better of the two companies, its stock had a greater value. To determine the excess value, he approached the problem as he would for underwriting purposes. Upon the theory that a Wisconsin security dealer would have to be the purchaser and place the shares on sale at a price competitive with other Wisconsin stock, he then selected seven Wisconsin corporations as comparable corporations, and the Indian Motocycle Co., for obtaining certain averages. The figures collected showed that the average selling price of stock of the eight companies on July 23, 1941, was eight times average share carnings for the period from 1936 to 1940, inclusive. Application of this result to the figure $14.34 as representing the average share earnings of the corporation for the same period indicated a maximum price of $114.72 a share. He regarded this maximum price as being adversely affected by the close ownership of stock of the corporation; lack of a market for the remainder of the corporation's stock; the limited field and declining market for the corporation's product; the corporation's inefficient plant and the *327 low salaries of officers of the corporation; and, accordingly, reduced the factor from eight to seven to arrive at a figure of $100.38, from which he deducted a dealer's discount, estimated at 10 per cent of the offering price, to arrive at the amount of $90.35, which he testified was the fair market value, a share, of the stock on July 23, 1941. The respondent's expert witness testified to a fair market value of $122.48 a share for the stock as of July 23, 1941. In determining such a value he first found that the stock of 20 metal working companies, which he regarded as having characteristics comparable to the corporation, sold on listed and unlisted markets on July 23, 1941, for 6.59 times average earnings for the previous year. Three other corporations were selected as being entitled to special emphasis and the selling prices of their stock as compared with earnings were used to reduce the general average to a factor of 5.86, which figure was reduced to 5.50 to compensate for lack of publicity of the corporation's stock when compared with the listing of the stock of the comparative corporations on the New York Stock Exchange. The final factor of 5.50 was then applied to earnings *328 of $22.27 a share of the corporation for 1940 to arrive at a fair market value of $122.48 a share for the stock on July 23, 1941. Valuation of stock on a specified date under circumstances such as are present here require consideration of every material fact of record having a bearing upon the question. Augustus E. Staley, 41 B.T.A. 752. Neither expert witness went that far in arriving at his conclusion. Petitioner's witness assumed as a premise that the buyer would be a stock dealer in Wisconsin and that the price to him would be 10 per cent less than his selling price. The effect of such treatment is to restrict the market that must be assumed in a question of this sort and to reduce the value by a selling cost, an expense to be borne by the seller. Scott v. Henricksen, D.C.W.D. of Washington, [29 AFTR 1465]. He gave no consideration to the dividend record of the corporation or of any of the corporations he used as comparatives, and it does not appear that he gave any weight to the book value of the stock, which he determined to be $135.19 a share on September 30, 1940, and an average amount of $127.11 for the five-year period used in his computation. *329 Such book value on September 30, 1941, was about $152 a share. The issue requires consideration of book value. Mathilde B. Hooper, 41 B.T.A. 114; Eleanor Lansburgh, 35 B.T.A. 928 (935). The witness regarded some part of the earnings of the corporation to be attributable to inadequate salaries of its officers. No evidence was offered to establish what the salaries should have been, if they were, in fact, inadequate for services rendered. Furthermore, he had no knowledge of the salaries paid to officers of all of the seven corporations he used as comparatives. The respondent's expert witness reached his opinion prior to the hearing and did not in any wise alter it to reflect facts of record, which were not considered in his computation. For instance, he did not take into account decreased foreign sales for the corporation's product or decreased sales for police duty. He regarded a good dividend record over a period of 10 years as a favorable factor in seeking a buyer for the stock, yet he testified that a dividend record over a period of five years would not have changed his result. Valuation of stock is more than a matter of formula. Estate of James Smith, 46 B.T.A. 337.
*330 No useful purpose would be served by discussing further evidence in the record. Our opinion, reached from a consideration of all of the evidence of record, is that the stock had a value of $110 a share on July 23, 1941, for estate tax purposes. The remaining question relates to the allowance as deductions from the gross estate of additional amounts for attorneys' and administrator's fees incurred as the result of the assertion of the deficiency herein. The issue was not abandoned at the hearing, but no evidence was offered on the question. It is referred to in petitioner's brief as an issue not in dispute but is not set forth as an issue or discussed in the brief of the respondent. Under the circumstances, the parties may reach an agreement on the issue for inclusion in their recomputations under Rule 50. Decision will be entered under Rule 50.