Northwest Telephone Co. v. Commissioner.
Northwest Tel. Co. v. Commissioner
Docket No. 108319.
United States Tax Court
1943 Tax Ct. Memo LEXIS 150; 2 T.C.M. (CCH) 636; T.C.M. (RIA) 43389; August 17, 1943
S. J. Bischoff, Esq., and Robert T. Jacob, Esq., 917 Public Service Bldg., Portland, Ore., for the petitioner. E. A. Tonjes, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined a deficiency in income tax and excess profits tax for the year 1937 in the respective amounts of $371.75 and $244,69. Petitioner concedes one adjustment which respondent made. The only adjustment contested is the disallowance of $1,981.81 for depreciation. The only question in issue is the basis to petitioner of its properties for purposes of computing allowance for depreciation. Petitioner filed its return for the year 1937 with the collector for the district of Oregon. Findings of Fact 1. Petitioner, an Oregon corporation, was incorporated April 10, 1929. Its principal office is at Hillsboro, Oregon. Its business is the operation of a public telephone service business in the states of Oregon and Washington. 2. Petitioner's authorized capital stock consists of 500 shares of common stock having a par value of $100 per share, and 500 shares of preferred stock. The preferred stock has never been issued. All of the *151 common stock is issued and outstanding. Petitioner also has issued bonds in the principal amount of $80,000. The common stock and bonds were issued shortly after petitioner was organized under circumstances set forth hereinafter. 3. The Sheridan-Willamina Telephone Co., an Oregon corporation, maintained telephone exchanges at Sheridan and Willamina, Oregon. It maintained toll lines throughout Yamhill and Polk counties, Oregon. Charles E. Wells and G. W. Wells were president and secretary of Sheridan-Willamina. The total outstanding stock of this company, hereinafter called S-W, was 5,000 shares. In 1929, Charles E. Wells owned at least 4,050 shares. 4. The Deschutes Mutual Telephone Company, an Oregon co-operative association, maintained an exchange at Redmond, Oregon. It maintained toll lines throughout Deschutes and Crook counties, Oregon. In 1929, Charles E. Wells and William G. Hare were president and secretary of Deschutes Mutual. The total outstanding stock of this company comprised 84 shares. In 1929, Charles E. Wells and William G. Hare owned 82 shares of Deschutes stock. They also owned the real property and building in Redmond, Oregon, in which the exchange was located. *152 They had purchased this from an individual owner. The total cost of the stock and property was $39,680.94, of which Wells contributed $33,036.66, and Hare contributed $6,644.28. Of the total sum, $39,680.94, the sum of about $5,000 was the price paid for the telephone exchange building and real estate, so that about $34,680.94 was the price paid for the stock. The above stock and property were purchased by Wells and Hare in September of 1928. 5. In August of 1928, Earl W. Gates purchased all of the physical properties of a telephone company called the Skamania Cooperative Telephone Association of the State of Washington for the total sum of $11,909.37. All of these properties were located in Stevenson and Skamania counties in the State of Washington. All of these properties were deeded to Gates on August 8, 1928. 6. In the early part of 1929, Wells owned stock in two other telephone companies, Yamhill County Mutual Telephone Company and Dayton Telephone Company, to the extent of about 47 shares, altogether. Such number of shares represented minority holdings in these companies. [1]
*153 7. Gates contemplated the purchase of the properties of Skamania in May of 1928 when he paid consideration for an option on the property. After he acquired the option he discussed with Wells the possibility of purchasing some other telephone companies and consolidating all of them into one company. In August the matter was discussed with Hare who was closely associated with Wells. Hare is an attorney. Gates and Wells had been engaged in owning and operating telephone companies for many years. A tentative plan was made to organize petitioner. It was contemplated that the operating properties which petitioner would eventually acquire and operate would be the properties formerly owned by the Skamania Association and the properties owned by S-W and Deschutes. Before any definite plan was agreed upon, however, Wells, Gates, and Hare engaged a telephone engineer, W. W. Hardinger, to make an appraisal of each of the three groups of physical properties, exclusive of the properties owned by the Yamhill and Dayton companies. After Hardingers' appraisal was made, i.e., in the spring of 1929, a final agreement was made to organize petitioner. 8. Hardinger's appraisal was made as of December *154 31, 1928. It was completed in January of 1929. He used a method of valuation known as estimated cost of reproduction of the properties. His appraisal reported two values for each group of properties, "Cost New" and "Cost Less Depreciation." His report upon each group of properties was as follows: Cost Less
Cost New
Depreciation
Skamania properties
$ 36,176
$ 32,095
Deschutes properties
91,718
83,586
Sheridan-Willamina prop-
erties
96,646
84,174
Total
$224,540
$199,855
9. Gates believed that the fair market value of all of the above properties was not more than $130,000. That sum was agreed upon by Wells, Gates, and Hare as a basic amount, and when petitioner was organized, or shortly after, after all steps in the transaction were completed, petitioner issued securities in the principal amount of $130,000, consisting of $50,000 par value common stock and $80,000 principal amount bonds. Also, when accounts were set up on petitioner's books under the date of June 1, 1929, the book values of net assets totaled $130,000 against bonds and capital stock of $130,000 as follows: Charges
Credits
June 1, 1929 - Undistributed cost
of properties
$130,000
First Mortgage bonds
$80,000
Common Capital stock
$50,000
*155 10. It was agreed originally that the interests of the three organizers in petitioner should be as follows: Wells should have a 50 percent interest; Gates and Hare should each have a 25 percent interest. A subsequent adjustment in these interests was made after all of the transaction was completed. However, originally, the common capital stock of petitioner was issued, on April 25, 1929, 250 shares to Wells, and 125 shares each to Gates and Hare. 11. The above stock was issued under the following circumstances in exchange for property owned by each person as follows: (a) A meeting of the board of directors of petitioner was held on April 25, 1929. At this meeting Wells, Gates, and Hare reported that they owned the following property: 1. 4,050 shares of stock of the Sheridan-Williamina Co. 2. 75 [2] shares of stock of the Deschutes Mutual Telephone Co. 3. 7 shares of stock of the Yamhill County Mutual Telephone Co. 4. 37 shares of stock of the Dayton Telephone Co. 5. All of the physical properties *156 formerly owned by the Skamania Co-operative Telephone Association. 6. Lot 3, Block 26, in Redmond, Deschutes County, Oregon, (the property where the exchange of the Deschutes Company is located). They reported, also, that all the above properties were "reasonably and fairly worth the sum of $130,000." They offered to transfer all of the above property, stock, real estate, and physical properties to petitioner in exchange for 500 shares of the common capital stock of petitioner of a par value of $50,000, for which stock they had subscribed, and for bonds of petitioner in the principal amount of $80,000, to be issued later and delivered to them, the bonds to be 6 percent, 20-year bonds, secured by a deed of trust on all of the properties of petitioner. They stated that Wells owned 50 percent of the above property to be conveyed to petitioner, and that Gates and Wells owned 25 percent, each, of the property, and that was agreed. The directors "agreed" that all of the above properties had a "fair and reasonable and actual value of $130,000"; and that the bonds to be issued in the suggested amount of $80,000, together with the amount of the stock subscriptions, $50,000, "represent the *157 actual value of the said properties to be turned over to the corporation". The directors adopted a resolution stating that the offer of Wells, Gates, and Hare was accepted to receive the above described properties and stocks, in full payment of the subscriptions to 500 shares of petitioner's common stock, and that "in addition thereto and as balance payment for said properties", the petitioner should execute and deliver to a trustee a deed of trust covering all of the properties of the petitioner and securing an issue of 6 percent bonds payable in 20 years in the total principal amount of $80,000; and that petitioner should issue and deliver $40,000 of the bonds to Wells, and $20,000 of the bonds to Gates, and $20,000 of the bonds to Hare; that upon conveyance of the above described properties and stocks to petitioner, petitioner should issue its common stock, 250 shares to Wells, 125 shares to Gates, and 125 shares to Hare, as fully paid and non-assessable stock; and that it was understood that "it is the purpose of the Corporation before the issuance of said bonds to make purchase of the physical properties of each of the Corporations herebefore named, and that said physical properties *158 be covered by the Deed of Trust". Although the resolution as quoted above referred to "Corporations herebefore named", which literally refers to four corporations, to wit, S-W, Deschutes, Yamhill, and Dayton, such was not intended. It was intended, at least for the then immediate present, to have the deed of trust cover only the properties of S-W and Deschutes, and the physical properties formerly owned by Skamania. The operating properties of petitioner were to comprise the properties formerly owned by those three companies only. Petitioner was to purchase the physical properties of S-W and Deschutes from those companies. The stock in Yamhill and Dayton which petitioner was to acquire from the organizers of petitioner was a small part of the outstanding stock of each company. If petitioner was to purchase, later, the property of Yamhill and Dayton, such fact is not shown in this proceeding. (b) Thereafter, on April 25, 1929, certificates of stock were issued to Wells, Gates, and Hare in the respective numbers of shares agreed. (c) The stocks described above were transferred to petitioner, and, under a deed dated March 27, 1929, Gates and his wife conveyed the Skamania properties *159 to petitioner. 12. After due authorization pursuant to a resolution adopted at a director's meeting held on May 6, 1929, petitioner made offers to purchase the business, franchises, and properties of S-W and Deschutes for the respective prices of $12,700 and $14,006. Special meetings of the stockholders of S-W and Deschutes were held on May 20, 1929, and May 22, 1929, respectively. At the meeting of the stockholders of S-W, there were present stockholders owning 4,870 shares of a total of 5,000 shares of issued stock; and at the meeting of the stockholders of Deschutes, there were present stockholders owning 82 shares of a total of 84 shares of issued stock. The above offers were accepted at the offered purchase prices by duly adopted resolutions. The stockholders of Deschutes voted to dissolve the company and Charles E. Wells, Theodore J. Wells, and Cassie Wells were appointed trustees to "wind up" the affairs of the company. The stockholders of S-W adopted a resolution to settle its affairs and dissolve the corporation. The respective properties of S-W and Deschutes were conveyed to petitioner by deeds dated May 20, 1929, and May 27, 1929. The two companies were not dissolved immediately *160 because of some problem in locating the minority stockholders. 13. There was no payment of cash consideration for the physical properties made by petitioner direct to the S-W and Deschutes companies because petitioner was the chief stockholder of the companies and, in the end, upon formal liquidation, such payments would have been returned to petitioner. Besides, at the time, petitioner did not have cash to pay for the above properties. To avoid taking the formal steps of making a payment of the purchase price, a short-cut procedure was followed which was to take care of the holders of 2 shares of Deschutes stock owned by outsiders and 950 shares of S-W stock. It was contemplated that petitioner would purchase the stock of the minority stockholders at the book value of the stock, and a reserve was set up on petitioner's books for that purpose. The purchase price of the properties, $12,700 and $14,006, was arrived at by finding the book values of the stocks of S-W and Deschutes. That is, according to the book values, the 5,000 shares of S-W stock had a book value of $12,700, and the 84 shares of Deschutes had a book value of $14,006. The arrangement to purchase the properties at these *161 figures was for the purpose of acquiring the stock of the minority stockholders at the book values of the stock. If there had been a straight liquidation of both companies, distributing the assets of each to the stockholders, it would have been necessary to issue some of petitioner's stocks and bonds to the minority stockholders of both companies in exchange for their stock in the original companies, and petitioner's stockholders desired to avoid that result. In order to avoid that result, the procedure adopted was to purchase the physical properties of each company at a price equal to the book values of the total outstanding stock of each company. Since petitioner was in control, this plan could be carried out. 14. At a meeting of petitioner's directors on June 12, 1929, petitioner's president reported: * * * that pursuant to authority in him vested, he had made purchase for and in behalf of this Corporation, of the business, franchises and property as a whole of the Deschutes Mutual Telephone Company, a co-operative association, at and for the price of $14,000.00 and of the business, franchises and property as a whole of the Sheridan-Willamina Telephone Company, an Oregon corporation, *162 at and for of $12,700.00, and have [had.] received proper conveyances therefor and have [had.] completed said purchases. Also, at the same meeting, the issuance of $80,000 of bonds was authorized to be issued; $40,000 to Wells, and $20,000 to Gates and Hare, each. 15. The book entries on petitioner's books, which were made as of June 1, 1929, set up the three telephone systems known as Skamania, S-W, and Deschutes at a total value of $122,740.59, and, the current assets and liabilities of Skamania, S-W, and Deschutes, all of which companies were going concerns, were taken over and assumed by petitioner in a total net amount of $2,686.08, making a total of $125,426.67, as the value of the 3 groups of properties and business enterprises. The difference between that figure and $130,000, which is $4,573.33, represents a net figure on the books "undistributed cost of properties", made up as follows: Item
Charges
Credits
Dayton Telephone Co. stock
$3,360.00
Wm. G. Hare - acct. r.
1,630.00
J. E. Proffett - acct. r.
210.00
Organization - expense
409.69
Due to stockholders of ac-
quired companies: S-W Telephone Co.
$1,000.00
Deschutes
36.36
Undistributed cost of prop-
erties
4,573.33
$5,609.69
$5,609.69
*163 16. The entries on petitioner's books to carry over the current assets and liabilities of Skamania, S-W, and Deschutes show the following totals: Current Assets Taken Over
Skamina
S-W
Deschutes
Cash, bills receivable, accts. receivable, materials and
supplies, prepayments
$1,223.11
$3,225.84
$5,365.91
Liabilities Assumed
Skamina
S-W
Deschutes
Accounts payable, notes payable, accrued liabilities
$1,350.98
$3,305.48
$2,472.32
The liabilities of Skamania exceeded current assets by $127.87; the liabilities of S-W exceeded current assets by $79.64 (total $207.51); the current assets of Deschutes exceeded its liabilities by $2,893.59; the combined current assets exceeded the combined current liabilities by the net amount of $2,686.08. That amount was carried on the books as "undistributed cost of properties." 17. The physical properties were carried on petitioner's books at the following amounts: Skamania
$ 19,244.47
S-W
52,423.07
Deschutes
51,073.05
Total
$122,740.59
18. Prior to the organization of petitioner, Wells, Gates, and Hare discussed the matter of the interest which each would have in petitioner. It was agreed that Wells *164 would have a 50 percent interest, and Gates and Hare would have 25 percent interests. However, on the basis of cash expenditures, in most instances, the contribution of each person to the pool of stocks and properties to be conveyed to petitioner was not in the proportions of one-half and one-quarter, respectively, as the following summary shows: Wells
Cash spent for 82 shares
Deschutes stock and real
estate in Redmond location
of exchange
$33,036.66
S-W stock, 4,050 shares
24,000.00 [3]
Cash to be advanced to peti-
tioner for working capital
1,409.69
$58,546.35
Gates
Cash paid for Skamania
properties
$11,909.37
Hare
Cash paid to purchase Des-
chutes stock and property
$ 6,644.28
The three persons treated all the above amounts as "costs" of the stocks, properties, and cash to go to petitioner. The amounts total $77,000, [4] and 1/2, 1/4, and 1/4 of such *165 total amount is $38,500, $19,250, and $19,250. However, Wells' contributions exceeded $38,500 by $19,946.35, and Gates' and Hare's contributions were less than $19,250 each, to the extent of $7,340.63 and $12,605.72. In order to bring about the desired proportionate interests in petitioner's stock, Gates and Hare agreed to pay Wells, in cash, $7,340.63 and $12,605.72. No such payments were made to Wells prior to the organization of petitioner and prior to the transfer to petitioner of the stocks and properties. After petitioner had been organized and had acquired the above properties, Gates paid the agreed amount in cash to Wells, but Hare was *166 unable to pay all of his amount. He paid about one-half and transferred to Wells one-half of the stock in petitioner which he had received in April of 1929. In the end, after the inter se cash adjustments were made between the three persons, Wells owned 312 1/2 shares of petitioner's stock, 62 1/2 percent; Gates owned 125 shares, 25 percent; and Hare owned 62 1/2 shares, 12 1/2 percent. None of the cash paid by the individuals to each other in these adjustments was received by petitioner. [5]
19. Petitioner, in its return, deducted the amount of $4,723.72 for depreciation on the three groups of properties for the year 1937. Respondent allowed the amount of $2,741.91 for depreciation. The explanation given for this adjustment is as follows: In your return you reported that you were organized on March 29, 1929, and that your business is not the outgrowth, result, continuation or reorganization of a business or businesses in existence prior thereto. The records of this office show, however, that you were organized for *167 the purpose of acquiring certain properties then in use in providing telephone service for communities located in Skamania County, Washington, and Deschutes and Yamhill Counties, Oregon, and that you did acquire and have at all times thereafter operated such properties. The Bureau holds that these properties were acquired in tax free exchanges and that your basis for computint [computation] depreciation is limited to the basis in the hands of the predecessor operating entitles. [entity] Computation of depreciation on that basis results in an allowance of $2,741.91, in lieu of $4,723.72 deducted on your return. Taxable income reported has, therefore, been increased by the difference between these sums, or $1,981.81. * * * The fair market value of all of the properties which petitioner acquired in 1929 pursuant to a unified, integrated plan, did not exceed $77,000 at the date of the issuance of petitioner's stock and bonds which were given in exchange for the properties, and the fair market value of petitioner's stock and bonds, so issued, did not exceed $77,000. Opinion The Commissioner has allowed petitioner a deduction of $2,741.91, as the depreciation allowance for the year 1937 *168 for all of its depreciable properties. Petitioner took a deduction for depreciation in the amount of $4,723.72. The question is whether respondent erred in disallowing $1,981.81 of the depreciation deduction claimed. The record does not show the amount which either party used as the basis to petitioner of the depreciable properties in question in making their respective computations of the annual allowance for depreciation. Petitioner has alleged in its petition that respondent erred in disallowing $1,089.81, which has been corrected at the hearing to $1,981.81. The facts upon which petitioner intended to rely are stated to be, in the petition, that the properties of the three original telephone companies were owned by Wells, Hare, and Gates who had acquired them at a total cost of $75,590.31; that they transferred, or caused to be transferred, to petitioner all of the properties in exchange for petitioner's stock, $50,000, and bonds, $80,000; that the "cost" to petitioner of all of the operating properties, land, buildings, office equipment, lines, exchanges, furniture, etc., was a total of $122,740.39, which it now appears was the total of the book values which petitioner ascribed *169 to the properties when its books were set up. Respondent has entered a general denial to the petition. In its brief, petitioner contends that the basis of the properties is the cost thereof to petitioner, and that the cost is $130,000, the alleged fair market value of petitioner's stock and bonds on the date of the exchange in 1929. If petitioner's contention on brief constitutes a claim that the basis is greater than petitioner used in making the computation in its return, which we do not know; nevertheless petitioner has not made any claim for a deduction in a greater amount than it took in its return. In his brief, respondent contends, first, that petitioner has not overcome the presumption of correctness of his determination, as follows: The determination of the Commissioner comes before the Court with a presumption of correctness and in order for the Court to find that the determination is erroneous the petitioner must first prove that the transaction, whereby the petitioner acquired the assets in question, was not a tax free transaction as held by the Commissioner, so that the basis of the assets is different in the hands of the transferee and the petitioner, and second, *170 assuming that the petitioner has shown that it is entitled to use a different basis, then it must show that the fair market value of the property given to the transferees for the assets in question is greater than that used by the respondent. Respondent argues that none of the testimony, separately or collectively, establishes that the fair market value of the properties is $130,000, "or any other value." Respondent contends that petitioner's chief witness on value, Gates, not only failed to state how he arrived at a total fair market value of $130,000, but that he also failed to explain how properties which cost the three individuals "only $77,000" could have a fair market value of $130,000 under the rule that "Cost is always the best evidence of value." Finally, respondent argues as follows: Respondent therefore submits that whether the transaction, or series of transactions, whereby the petitioner acquired the assets of the Skamania Telephone Company, the Deschutes Telephone Company, and the Sheridan-Willamina Telephone Company, be treated as a taxable or a non-taxable transaction, the petitioner has failed to show that the fair market value of the assets turned over to the petitioner *171 for its stocks and bonds was greater than the values allowed by the Commissioner in his determination of allowable depreciation. In addition to the foregoing, the respondent contends that the transaction or series of transactions which resulted in the organization of the petitioner constitutes a non-taxable exchange and therefore the base of the assets in question for depreciation purposes is the same as in the hands of the predecessor owners. There is no doubt at all that it was intended for the petitioner to acquire all of the physical assets of the Sheridan-Willamina Telephone Company and the Deschutes Telephone Company, together with the assets which formerly constituted the physical properties of the Skamania Telephone Company which had theretofore been acquired by Gates, and while the transaction took the form of a transfer of the stock of the Sheridan-Williamina and Deschutes Companies for capital stock of the petitioner, the transaction was in substance a transfer of the assets of these two corporations for capital stock of the petitioner. In other words, the petitioner acquired all of the assets of these two corporations, together with the assets owned by Gates, for its *172 capital stock, and respondent contends that under the provisions of Sections 112 (b) (5), 113 (a) (8), and 114 (a) of the Revenue Act of 1928 no gain or loss is recognized on the transaction and the base for depreciation purposes is the same as in the hands of the predecessor corporations. The question presented is only whether respondent's determination is correct, as we find the issue pleaded. That question turns on whether petitioner is entitled to use as a basis for computing depreciation allowance some amount greater than respondent has determined and used. The substance of petitioner's contention is that it is entitled to use a "stepped-up" basis. Upon due consideration all of the evidence we believe petitioner has failed to overcome the presumption of correctness of respondent's determination. If we assume, arguendo, that petitioner has established that it did not acquire all of the assets of two corporations, together with the properties owned by Gates, in a transaction which comes within the provisions of section 112 (b) (5), so that it was a taxfree transaction and so that the basis of the former owners of the properties carried over to petitioner, petitioner must *173 establish that its cost for all of the properties was $130,000. If petitioner has failed to establish that amount as its cost, respondent must be sustained, as we are given to understand the question presented. It appears that respondent has determined that the basis to petitioner of all of the depreciable properties was not more than $77,000. In our opinion, petitioner has failed to establish that its cost is $130,000 for the following reasons: 1. In August of 1928 Gates purchased the Skamania properties for a total sum of $11,909.37 in an arm's-length, purchase transaction. That amount must be, therefore, the fair market value of the Skamania properties on April 25, 1929. The testimony of one of petitioner's witnesses is that telephone properties don't change values very fast. There is no evidence to show that the properties had any greater value on April 25, 1929. Gates did not express any opinion on the fair market value of the separate Skamania properties on the crucial date, and he did not explain why the value of the properties was increased by about $7,335 to $19,244.47 on petitioner's books. Sales price in an arm's-length purchase is the best evidence of values. Paul & Mertens, *174 Law of Federal Income Taxation, Vol. 5, p. 720, par. 52.10; Estate of Leonard B. McKitterick, 42 B.T.A. 130, 136, 138. The total cost of the Redmond property and the stock of Deschutes to Wells and Hare under an arm's-length purchase thereof in September of 1928 was $39,680.94. They purchased all but 2 shares of the outstanding stock. This is strong evidence that the value of all of the assets of the Deschutes property at the date of the above purchase was about $39,680.94. It is unreasonable to believe that the total assets of that company had a greater value. In many instances the value of stock depends upon the value of the underlying assets in which the stock evidences ownership. Gates did not testify as to the separate fair market value of the Deschutes properties; he did not explain why the values thereof were written up on petitioner's books by about $11,392.11 to $51,073.05. Wells, at one time, made a sworn statement that the 4,050 shares of S-W stock cost him around $18,700, and that he and Gates and Hare agreed that it had a value of $24,000 in April of 1929. There were 5,000 shares outstanding, of which the 4,050 shares transferred to petitioner *175 represent 81 percent. Gates did not testify to the separate fair market value of the assets of S-W. It is not reasonable to believe that total assets of S-W had a greater value than is indicated by the value which the three interested individuals placed upon the stock of that company as of April 25, 1929, and no explanation is given for ascribing a book value of $52,423.07, upon petitioner's books to the S-W properties which is considerably more than the value of all of the stock as measured by the value of $24,000 which was ascribed to 81 percent of the stock. Petitioner does not recognize the formal steps whereby petitioner "purchased" the assets of Deschutes and S-W, for the respective amounts of $14,006 and $12,700 as evidence of the fair market values of the properties, or as evidence of the manner in which it actually acquired the assets of those companies. There is room for holding petitioner to the formal steps which it took and, if such were done, it would be held that petitioner purchased the assets of those companies for the above amounts, which would establish petitioner's cost for the S-W and Deschutes properties. But it is unnecessary to give consideration to those *176 formal steps in the disposition of the issue. If the above holding were made petitioner's basis for these properties would be less than respondent has determined. It was at all times intended that petitioner would acquire all of the assets of S-W and Deschutes, and petitioner acquired those assets because of its ownership of the majority of the stock of the two companies. When Wells and Hare contributed the stock of those companies to petitioner they were, in effect, contributing to petitioner the properties behind the stocks, and that was their intent. Among themselves, Wells, Gates, and Hare agreed that the "property" which each would contribute to petitioner would be contributed on the basis of cost to the owners, excepting the S-W stock which was contributed by Wells at a value of $24,000, and that working capital of $1,409.69, in cash, would be contributed by Wells. Thus the total property to be contributed to petitioner was valued in a "Statement of Costs Incurred in Purchase of Properties of Northwest Telephone Co." which was prepared prior to the organization of petitioner as follows: * 82 shares of stock of Deschutes Tel.
Co.
$39,680.94
Purchase of 4,050 shares of S-W Tel.
Co.
24,000.00
Purchase of physical properties of
Skamania
11,909.37
Working capital
1,409.69
Total
$77,000.00
*177 It was understood and agreed that Wells' contribution was to be $38,500; Gates' contribution was to be $19,250; and Hare's contribution was to be $19,250, or, respectively 1/2, 1/4, and 1/4 of $77,000, and that to adjust the respective contributions to those amounts, Gates and Hare were to pay Wells cash to increase their contributions and to reimburse him for all of his "costs" in excess of $38,500. That is; Wells had expended, they agreed, For S-W stock
$24,000.00
For Deschutes stock and property
33,036.66
Cash for working capital
1,409.69
$58,446.35
Gates had expended
11,909.37
Hare had expended
6,644.28
Total
$77,000.00 Also, Gates and Hare were to pay Wells, respectively, $7,340.63 and $12,605.72, so that the "cost" to each of them would be $19,250 each, and Wells' net contribution would be $38,500. What effect is to be given to these arrangements for the purposes of the question in this case? Wells and Gates were specialists in the business of buying, selling, and operating telephone systems. It is not reasonable to believe that Wells would agree to be paid only $18,536.66 (excluding the cash item of $1,409.69), *178 for a part of his interest in the properties of S-W and Deschutes if, in fact, the fair market values of the properties of the two companies was a total of $103,496.12, the book value which was adopted and ascribed to those properties after petitioner was organized. Upon such value a prudent business man would exact a proportionately greater payment for his interest in such valuable properties than $18,536.66. We do not believe the parties to the transaction considered that the assets of S-W and Deschutes had a greater fair market value than approximately $57,036.66, the cost of the stock which was contributed. In conclusion, it is our view that the best evidence of the fair market values of the S-W, Deshutes, and Skamania properties on April 25, 1929, is the amounts which those properties cost Wells, Hare, and Gates in arms'-length purchases, which amounts, they agreed to be the basis for their inter se cash adjustments. (It is immaterial that, in the end the inter se adjustments were made otherwise than by cash with respect to Hare. Gates paid the agreed cash to Wells, and Hare relinquished stock to Wells in accordance with the original agreed costs of the property to *179 each.) It has been found as a fact that the total fair market values of the properties of S-W, Deschutes, and Skamania on April 25, 1929, did not exceed $77,000. 2. Petitioner asks us to assume that Wells, Gates, and Hare, in the beginning of a single plan really owned all three telephone companies, and that they, in effect, transferred all of the properties of the three companies to petitioner in exchange for its stock and bonds. For purposes of argument only, we have assumed that petitioner has proved that the properties were not acquired in a tax-free exchange under section 112(b) (5). Pursuing petitioner's argument further, it is that, since the properties were not acquired in a tax-free transaction, the basis of the properties is not to be determined under section 113(a) (8), so that the basis shall be the same as it would be in the hands of the transferor; but, rather, the basis is to be determined under section 113 (a). Under that section the basis to petitioner is cost. Whose cost? The cost to petitioner, which, petitioner contends is the value of its "stock and bonds issued in payment." Petitioner says that, since petitioner was a new corporation, the "value of the stock *180 and bonds so issued is determined by the value of the physical property acquired." Petitioner has in mind the rule that where there is no other method of measuring the fair market value of the stock and securities issued in exchange for properties, the fair market value on the date of the exchange may be determined to be the equivalent of the fair market value of the property received. Ida I. McKinney, 32 B.T.A. 450, 456; affd., 87 Fed. (2d) 811; Gillette Rubber Co., 31 B.T.A. 483, 490; Rollestone Corporation, 38 B.T.A. 1093, 1107. Applying that rule here, and upon the finding made that the fair market values of the properties did not exceed $77,000, it is held that the value of petitioner's stock and bonds was no greater than $77,000, the value of the properties themselves, so that the basis to petitioner for all of the properties is not in excess of $77,000. 3. The conclusion reached is founded upon the assumption for purposes of argument that petitioner's theory is correct. But we have rejected petitioner's contention that the value of all of the properties *181 aggregated $130,000. In so doing, we have not accepted the opinion of Gates that the aggregate values were $130,000. This is necessitated, in our opinion, by the other evidence which is wholly inconsistent with Gates' opinion. The best evidence in the record before us of the value of the properties at the time they were acquired is the amount which the individuals had paid for them shortly before April 25, 1929. In view of the conclusions reached above, it is unnecessary to consider respondent's argument that the entire transaction came within section 112 (b) (5). Respondent's determination is sustained. Decision will be entered for respondent. Footnotes
1. The record is incomplete and inconsistent on the point of the total number of shares of stock in these two companies. In one exhibit the number of shares in both companies is said to be 47 shares; in another exhibit it is stated that 7 shares of stock of Yamhill and 37 shares of stock of Dayton were held by the three individuals prior to the organization of petitioner. There is little testimony on this point.↩
2. Wells and Hare had purchased 82 shares of the Deschutes stock but had not received the assignments to all of the shares. At some later date, all of these shares were transferred.↩
3. Wells treated the 4,050 shares of S-W stock as having a value in April 1929, of $24,000. In 1934, Wells executed a sworn statement that he had paid $18,700 for this stock but that he and Gates had agreed that the stock had a value of $24,000 at the time petitioner was organized.↩
4. Added to this is the cost of the Yamhill and Dayton stock of $4,200, which stock it appears, was to go to petitioner. The record is not clear on these stocks, and, for convenience, they are not discussed above. However, the plan was that adjustments were to be made between the parties to take into account these stocks, and that the interests of the individuals in these stocks was to be 50 percent, 25 percent, and 25 percent, and that cash was to be paid by Gates and Hare to Wells to adjust the respective interests to such properties.↩
5. The record does not show whether Hare transferred to Wells one-half of the bonds of petitioner which he received originally. The presumption is that he did.↩
*. The above follows the text of Ex. 4.↩