Estate of Warren H. Poley, Emily C. P. Longstreth, Executrix v. Commissioner.
Estate of Warren H. Poley, Longstreth v. Commissioner
Docket No. 7096.
United States Tax Court
1947 Tax Ct. Memo LEXIS 276; 6 T.C.M. (CCH) 288; T.C.M. (RIA) 47065; March 7, 1947
*276 Value on November 2, 1942, of 400 shares of Smith, Kline & French Laboratories stock determined. Walter C. Longstreth, Esq., 704 Bailey Bldg., 1218 Chestnut St., Philadelphia 7, Pa., for the petitioner. Robert H. Kinderman, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: The sole issue in this proceeding is the value of certain stock for estate tax purposes on November 12, 1942. The executrix filed an estate tax return in which 400 shares of this stock were valued at $120 a share. The respondent found the value to be $180 per share and determined a deficiency of $6,568.98 in estate tax. In an amended petition the petitioner seeks to have the value fixed at $110 per share, and requests a decision that there is an overpayment of $1,088.01. Findings of Fact Warren H. Poley died testate on March 2, 1942. Emily C. P. Longstreth is the duly qualified executrix of the testator. The Federal estate tax return was filed with the collector of internal revenue at Philadelphia, Pennsylvania. The executrix elected to value the property included in the estate as of the optional date. The assets of the estate included 400 shares *277 of common stock of Smith, Kline & French Laboratories, which were distributed on November 12, 1942. In the estate tax return the stock was valued as of that date at $48,000, $120or per share. Smith, Kline & Rench Laboratories, hereinafter referred to as the corporation, was incorporated in 1929 under the laws of Pennsylvania as successor to Smith, Kline & French Company, a corporation formed in 1888. These corporations carried on a business of manufacturing medicinal specialties commenced in 1841. The corporation had no bonded debt. Its preferred stock was retired before 1933. On November 12, 1942, there were 40,018 shares of common stock outstanding. At the end of 1942 there were 225 stockholders. The individuals holding the largest numbers of shares were C. Mahlon Kline, president - 5,225 shares; and Francis Boyer, executive vice-president - 3,421 shares. The Estate of Mahlon N. Kline held 5,600 shares and the Estate of Harry B. French held 5,920 shares. The Estate of Mahlon K. Smith held 1,942 shares. The Estate of Caroline A. Buck held 1,710 shares and the Guardian for Elizabeth F. Ranney held 1,942 shares. There were 50 stockholders each holding less than 1,000 shares but *278 having at least 100 shares, and 168 stockholders having less than 100 shares each. The common stock of the corporation is not listed on any stock exchange. It is traded in over-the-counter transactions. The following transfers of shares are shown on the books of the corporation from January 1, 1941, through February 3, 1943, excluding transfers to brokers for sale and distributions by decedents' estates to beneficiaries: Selling
Date of
No. of
Price
Transfer
Shares
Per Share
1941
1- 8
3 $190
1-13
10
190
7
190
5
190
4
190
2-20
3 $200
18
200
3- 6
50
177.50
3-21
3
200
3-21
25
193
4-18
10
200
5-29
50
208
6
195
6- 4
13
205
6-16
5
192
6-25
7
188
6-26
8
190
8
190
8-12
25
(unknown)
9-12
10
185
10- 1
20
190
12- 2
20
200
Selling
Transferee
No. of
Price
1942
of Shares
Shares
Per Share
1-29
Louis J. Meyers
8 $190
3-11
Mahlon K. Jordon
(sold early in Jan-
uary, 1942)
13
188
3-24
Louis J. Meyers
5
165
4- 8
Ethel S. C. Smith
10
180
6-10
Elizabeth F. Acton
15
164
7-21
Gordon A. Alles
10
167
8-12
23 employees and of-
ficers of the cor-
poration
335
125
8-13
John M. Taylor
40
125
8-21
Lillian E. Summers
& Clara S. Murray
12
122
8-21
Dorothy S. Burton
8
122
8-21
Wurts Dulles & Co.
50
122
8-26
Thomas C. Yocum
50
128
9- 3
Beatrice Adolph
Toole
50
(unknown)
*279 Selling
Date of
Transferee
No. of
Price
Transfer
of Shares
Shares
Per Share
9- 3
Mary M. Sprague
60
(unknown)
9-21
Kidder Peabody &
Company
10 $116
9-21
Rosalia A. Brown
20
(unknown)
9-29
Richard Harrington
10
(unknown)
10-23
Gordon A. Alles
21
144
1943
2- 3
28
135
20
(unknown)
The consolidated balance sheet of the corporation and its subsidiaries as of the end of 1941 and 1942 and the income statements for the years 1941 and 1942 are as follows: CONDENSED CONSOLIDATED INCOME STATEMENT
SMITH. KLINE & FRENCH LABORATORIES AND SUBSIDIARIES
1941
1942
Net Sales
$11,268,323.44
$13,337,579.26
Cost of Sales
7,273,452.08
8,597,655.46
Gross Profit
3,994,871.36
4,739,923.90
General & Selling Expenses
2,698,865.88
3,119,055.65
Balance
1,296,005.48
1,620,868.15
Other Income
14,138.69
11,472.36
Total
1,310,144.17
1,632,340.51
Other Deductions
18,152.24
22,332.97
Net Income before Income Taxes
1,291,991.93
1,610,007.54
Income Taxes - Domestic
$494,674.59
$894,112.69
Foreign, est.
98,217.00
592,891.59
134,462.80
1,028,575.49
Balance
699,100.34
581,432.05
Est. Post War Ref. Exc. Pref. Tax Acct.
50,590.28
Net Profit
632,022.33
Adjustment of Prior Years' Taxes, etc.
10,225.75
3,556.40
Total
709,326.09
635,578.73
Dividends Paid
$479,723.00
360,094.00
Carried to Res. Accts.
192,743.31
672,466.31
188,416.19
548,510.19
Increase of Avail. Surplus
36,859.78
87,068.54
Add. Stock Issued
4,250.00
4,250.00
Bal. Surplus, Jan. 1
1,020,007.64
1,061,117.42
Bal. Surplus, Dec. 31
1,061,117.42
1,152,435.96
*280 ASSETS
Dec. 31, 1941
Dec. 31, 1942
Current Assets
Cash
$ 543,167.15
$ 604,115.84
U.S. Bonds & Notes
77,500.00
124,265.75
Receivables
$975,411.44
$970,453.04
Less Reserves
135,655.69
839,755.75
135,655.69
834,797.35
Inventories
1,271,113.49
1,260,364.95
2,731,536.39
2,823,543.89
Cash and U.S. Notes & Bonds for Taxes
538,302.94
946,499.66
Plant Assets at Depr. Value
Land
80,884.70
80,884.70
Buildings
141,923.12
165,376.39
Machinery & Equipment
571,064.12
534,761.05
793,871.94
781,022.14
Less Spec. Contingent Res.
759,411.20
34,460.74
753,129.45
27,892.69
Post War Refund Exc. Prof. Tax Acct.
50,590.28
Foreign Investments - net
97,386.66
174,240.42
Misc. Accts. Rec.
55,486.00
163,150.62
Misc. Investments
1,000.00
1,000.00
Exp. Inven. Prepaid Adv. & Postage
101,497.83
32,608.64
Prepaid Ins. & Taxes
29,191.13
32,926.18
Trade Mark
1.00
284,562.62
1.00
454,517.14
3,588,862.69
4,252,453.38
LIABILITIES
Current Liabilities
Accounts Payable - Trade
462,603.85
450,284.71
Accounts Payable - Miscellaneous
325,166.22
353,233.05
Accrued Taxes
538,302.94
1,326,073.01
946,499.66
1,750,017.42
Reserves
For New Plant
200,000.00
200,000.00
For Inv. Adjustment
100,000.00
For Income Tax Adjustment
50,000.00
Capital Stock & Surplus
Capital Stock
1,000,000.00
1,000,000.00
Surplus
1,061,117.42
1,152,435.96
Outside Minority Int. in Avoset, Inc.
1,672.26
Total Liabilities, Capital & Surplus
3,588,862.69
4,252,453.38
*281 The value of trade marks was shown on the balance sheets at a nominal amount. The real value of the corporation's trade marks was $500,000, or more. The president of the corporation made annual reports to its stockholders. In such a report dated March 25, 1942, the president stated, in part: The Company has enjoyed the best year in its history, both in volume of business done and in amount of profits earned before taxes. Taxes, however, have taken the very formidable sum of $592,891.59, equal to $14.80 per share of stock. Nevertheless, after payment of taxes, we have been able to pay dividends of $12 per share during the year, to set aside extra reserves of $192,743.31 and increase our earned surplus by $36,859.78. The prospects for earnings during the year 1942 continue favorable; but we must contemplate that further increases in taxes may necessitate a reduction in our rate of dividend. The president stated, also, that the management was continuing its policy of research and development of medicinal specialities, that several products had been established on a profitable basis, that the company's products were being sold in every state and territory of the United States *282 and in 37 foreign countries and that these products were carried on the balance sheet at a valuation of $1.00. Frederic W. W. Graham died January 17, 1942, leaving an estate which included 800 shares of stock of the corporation. The Provident Trust Company, a co-executor of his estate, considered it advisable to sell a substantial part of this stock to diversify the holdings of the estate. Sales of this stock were made as follows: April 2, 1942
10 shares at
$180.00
June 1, 1942
12 shares at
155.00
June 2, 1942
3 shares at
155.00
Aug. 4, 1942
40 shares at
125.00
Aug. 5, 1942
335 shares at
125.00
Sept. 30, 1943
30 shares at
180.00
Oct. 1, 1943
70 shares at
180.00 Of the 335 shares sold on August 5, 1942, Francis Boyer purchased 155 and two other officers of the corporation purchased 55. The remaining 125 were bought by employees of the corporation in amounts of less than 25 shares. The estate tax return for the Estate of Frederic W. W. Graham valued 400 shares of the corporation's stock at $48,000 on January 17, 1943, the optional valuation date, a valuation of $120 per share. The 400 shares sold by the estate prior to that date were valued *283 at the net actual selling price of $49,019. The Bureau of Internal Revenue did not challenge these valuations. The corporation furnished a balance sheet each year to Dun and Bradstreet. This was the only information the corporation issued about its financial condition except to stockholders and to certain trust companies. The approximate earnings after taxes, the approximate earnings per share and the actual dividends declared were, for the years 1938 through 1942, as follows: Approximate
Approximate
Earnings
Year
Earnings
per Share
Dividends
1938
$529,400
$13.25
$ 8.00
1939
737,000
18.48
13.00
1940
688,000
17.20
12.00
1941
699,000
17.50
12.00
1942
631,000
15.77
9.00
The corporation or its predecessor paid quarterly dividends since 1922. The corporation prior to 1930 was making a full line of pharmaceuticals, some 700 items in all. It discontinued these products at the end of 1936. Prior to 1936 it developed a new line of products which were advertised to the medical profession and prescribed or used by physicians and surgeons for their patients. Some 10 or 12 of the new products were on a profitable basis by 1942. The corporation *284 followed a policy of research and development of medicinal specialties. On March 25, 1942, in view of the anticipation of larger profits and to keep the amount of bonus substantially the same, the board of directors voted a reduction in the rate of bonus to officers and principal employees after 1941. The corporation made capital stock tax reports to the Commonwealth of Pennsylvania. In the settlement of the corporation's liability for such tax for 1941 and 1942 the capital stock was appraised by the Commonwealth at $4,600,000 at the end of 1941, and $4,500,000 at the end of 1942. The National Quotations Bureau publishes quotations on over-the-counter securities for the information of its subscribers, most of which are investment houses and brokers. The daily sheets of this Bureau issued in October and November 1942 showed that one investment house offered to buy 20 shares of the corporation's stock at $115 a share on October 1st. This offer continued to October 28 and on October 29 the offer was $120 a share which continued through November 1942. Another firm wanted to buy 25 shares at $120 per share on October 30 and 31, 1942. The Quotation Bureau's monthly sheets show the *285 last quotation of each firm appearing on the daily sheets. The sheet for the month beginning October 10, 1942, showed five firms offering to buy the corporation's stock, one at $112 per share, the others at $120. For the month beginning November 12, 1942, there were the same number of offers and at the same prices. Two offered to buy 50 shares, one asked for 10; the quantity wanted by the others is not stated. The Quotation Bureau's semi-annual publication for the six months ending October 10, 1942, showed ten firms as interested in the corporation's stock, seven as buyers and six as sellers. One firm on October 8, offered to buy at $115 a share or to sell at $125. Another on October 9, offered to buy at $115 or sell at $130. For the next six months' period nine firms were listed, all as buyers and one as seller, and three of the nine were not on the list for the preceding six months' period. The value on November 12, 1942, of the 400 shares of the corporation's stock distributed by the Estate of Warren H. Poley was $60,000. Opinion The fair market value of 400 shares of stock of Smith, Kline & French Laboratories is to be found as of November 12, 1942. The respondent determined *286 this value to be $180 a share and that determination is presumed to be correct until the contrary is shown. The estate has introduced evidence of sales and of bid and asked prices, balance sheets, income statements, the president's report to the stockholders, and other evidence. The petitioner contends that the value of the stock is to be determined from the selling prices at actual sales of the stock near the valuation date, reduced because the block of 400 shares was too large to sell at such prices. The petitioner says that the sale of 400 shares by the Graham Estate had depressed the market price from about $180 to about $120 per share and that the 400 shares in the Poley Estate could not have been sold at better than an average of $110 per share within two or three months after the valuation date. The petitioner points to the bid and asked prices, the intrinsic value of the stock according to the balance sheets, the value based upon earnings, the opinions of experts, and the fact that the respondent accepted the valuation of $120 in the return of the Graham Estate as supporting the proposed valuation of $110 per share. The petitioner also calls attention to the depressed state *287 of the securities market generally in 1942 as a result of the state of progress of the war in that year. The respondent takes the position that the corporation has been controlled for 100 years by three family groups and is a close corporation; that it has had sound management and has kept up to date scientifically; is financially sound with an excellent dividend and earnings record and no bonded debt; that in these circumstances there is no real market for the stock and sales of it are rare; that the reduction in the price at which the stock sold in 1942 was a consequence of a forced sale of the stock owned by the Graham Estate and that such prices are not a true measure of the real value of the stock; in short, that the actual sales prices in late 1942 do not represent the "fair market value." The respondent points out that the stock sold at $180 per share as late as April 1942 and had returned to $180 by June 1943, and says this demonstrates that the true value of the stock is at least that much. By capitalization of earnings, the respondent, in several different calculations, reaches valuations approximating or exceeding $180 per share. The prices at which a stock is traded *288 on the open public market on the pertinent date have been held generally to be the best evidence of the fair market value of the stock on that date. Estate of Leonard R. McKitterick, 42 B.T.A. 130. The applicable regulations prescribe this as the test for value of a stock traded on the open market. Section 81.10 (c), Regulations 105. These regulations further provide that as to stocks not listed upon an exchange but which are dealt in through brokers or have a market, the fair market value shall be determined from the selling prices, and that where the value determined on the basis of selling prices does not reflect the fair market value, some reasonable modification of such basis or other relevant facts and elements of value shall be considered in determining fair market value. There were outstanding about 40,000 shares of stock of the corporation held by 225 persons. The members of the families of the three families held enough stock to control the corporation by voting together and there was no apparent disagreement among them. It was what is known as a close corporation. See Brooks v. Willcuts, 78 Fed. (2d) 870. The stock was not listed on an exchange *289 but was traded in to a very limited extent in over-the-counter transactions. In 1941 there were 22 sales involving 310 shares. In 1942 there were some 40 sales involving 727 shares, 400 of these shares being sold by the Graham Estate. The sale of shares by the Graham Estate evidently had the effect of depressing the price in the relatively small market that existed. The Provident Trust Company, as co-executor, considered it so essential to diversity the Estate's investments that, despite objections by the beneficial owners, it sold 375 shares at $125 a share in August 1942 after receiving $180 a share for some shares sold in April. Considering the infrequency of the sales, the small quantities sold and the circumstances under which some of the sales in 1942 were made, we do not regard the sales prices or the bid and asked prices as controlling in determining the fair market value. The sale nearest the valuation date was that of 21 shares $144at on October 23. The petitioner argues that the buyer in this sale was imposed upon and could have secured the stock at a lower price by dealing through a Philadephia broker. This sale was the only sale in October and there were no others until *290 February 1943. The respondent contends that in October the market was beginning to regain its normal balance. This explanation appears quite as reasonable as that of the petitioner. In so far as the sales are representative of value they tend to show a value of about $144 a share. Book value alone is not a reliable index of actual value. In this case the book value from the balance sheet at the end of 1942 was about $90 per share. The book value of good will was nominal while its actual value was in excess of $500,000, and possibly in excess of $1,000,000. This would make a difference of $12.50 to $25.00 or more per share on this account and give a value of from $102.50 to $115. When compared with the steady and substantial earnings record, the book value is clearly lower than the actual value. The earnings record of the corporation was excellent and the financial position was sound. Its net income for 1942 before taxes was in excess of $1,600,000, or about $40 a share. The outlook was favorable for continued earnings, as the report of the president indicated. The respondent calculates values in excess of $180 per share by capitalizing earnings at 9 per cent, or by using average *291 assets and average earnings and capitalizing tangible assets by 6 per cent and intangible assets at 10 per cent. These rates are, of course, arbitrary and, we think, give too high a value when compared with the asset value shown by the books. The Dow-Jones average of 30 industrial stocks showed a general decline from September 1941 to April and May 1942 and then a rise until the middle of 1943. In November 1942 the trend of prices of stocks generally was upward. The business outlook was affected by the fact that it could be foreseen higher tax rates would be necessary to finance the war with a resultant depression of values as profits were taken by taxation. However, the excess profits tax was known to be a war measure and of temporary application. The acceptance by the respondent of a valuation of $120 per share as to the stock in the Graham Estate is not controlling here. Our problem is to determine the fair market value on the valuation date of the stock of Smith, Kline & French Laboratories as a going concern from all the facts and circumstances of record. We have considered all the facts and circumstances of record and have determined that on November 12, 1942, the stock *292 owned by the Estate had a value of $60,000 or $150 a share. Decision will be entered under Rule 50.