FRANK J. KIER AND FRANKLIN G. MCINTOSH, EXECUTORS OF THE ESTATE OF MARY DENNISON MYLER, DECEASED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 47905.   Promulgated July 7, 1933.

*J. Roy Dickie, Esq.*, for the petitioners.
*R. F. Staubly, Esq.*, for the respondent.

OPINION.

GOODRICH: Petitioners, who are the duly qualified executors under the will of Mary Dennison Myler, who died on May 4, 1927, a resident of Pittsburgh, Pennsylvania, in this proceeding attack respondent's determination of a deficiency in estate tax of $35,243. The entire controversy relates to the value at which stock of the Standard Sanitary Manufacturing Co. owned by decedent at the time of her death should be included in her estate for purposes of the tax. A stipulation of counsel, which need not be here recited in full, sets forth facts respecting decedent's holdings, the business and condition of the company in which she owned stock, a record of market sales of the stock, and other matters necessary or helpful to a determination of value. Several annual reports of the president of the company to its stockholders, containing financial statements and other data, were put in evidence by agreement, and one witness, a member of a brokerage firm, was called to give expert testimony respecting the effect on the market of an attempt to dispose of a large block of stock.

At her death, decedent owned 36,610 shares of common stock, having a par value of $25 a share, of the Standard Co., which was then the largest manufacturer in this country of bath room fixtures. It had outstanding 1,078,162 shares of common and 47,614 shares of preferred stock, the latter of a par value of $100 a share. The common stock was listed on the Pittsburgh Stock Exchange and 30,274 shares were sold there during 1925 at prices ranging between $136 and $100 a share. In 1926, 36,914 shares were sold, the prices ranging from $118⅞ to $88; and in 1927, 78,151 shares were sold at prices between $114 and $78.50. During 1927 the sales of stock averaged about 5,200 shares monthly, except in October, when 21,088 shares

changed hands, at prices ranging from $106 to $94.75. In May 1927, the month in which Mrs. Myler died, there were sales of 3,583 shares at prices between $85⅞ and $83, and on the day of her death there were sales of 17 shares at $83.50 and 50 shares at $84⅜. During 1926, through its earnings, the company increased its surplus by more than two million dollars, and in 1927 the increase was nearly one million. In 1927 the company's earnings on its common stock were $6.92 a share, and dividends paid totaled $5 a share. For a five-year period including 1927, the average earnings were $6.49 and the average dividends paid, $5.65 a share. The book value of the stock was $40.72 as of December 31, 1926. It was valued by respondent at $53.81 a share as of June 30, 1926, for purposes of the capital stock tax. The taxing authorities of Pennsylvania, for the purposes of the state inheritance tax, valued the stock at $76.50 a share as of the date of decedent's death. In their return for Federal estate tax petitioners included the stock at the price fixed by the Pennsylvania authorities, $76.50 a share, and here contend that figure is the fair market value of the stock as of May 4, 1927. Respondent however has determined that the price to be used is $83$\frac{15}{16}$ a share, that being the mean of the sales on the day of decedent's death, and has so included it in the estate. From this action arises the deficiency herein.

On petitioners lies the burden of proving that respondent's determination is erroneous and of proving the correct value of the stock. Their sole argument before us is that the prices at which small amounts of the stock were sold on the day of decedent's death are not indicative of the fair market value of the large block of the stock owned by the estate, for the reason that an attempt to dispose of such large holdings would greatly depress the market, assuming that buyers could be found. We realize that in many cases that argument bears weight, although it has been rejected before, *Bingham* v. *Commonwealth*, 196 Ky. 318, and that respondent, in his later edition of the regulations then in force has made a change of rule to permit of a departure from that standard " where such selling prices do not reflect the fair market value." Art. 13, par. 3, Regulations 70 (1929 Ed.). But this theory cuts both ways. It frequently happens that the ownership of a large block of stock controls the management and policies of the corporation and that fact effects a great enhancement of value of the total holdings over that of smaller units. Consequently, the disclosure of the fact that respondent's valuation is based upon sales prices of but a few shares is not sufficient to prove it erroneous. Cf. *Francis E. Smith*, 1 B.T.A. 868.

Petitioners' witness was of the opinion, in view of the figures supplied him as to sales, that the market was a narrow one, indicating neither " that the stock is greatly wanted nor that it is desired to be sold " and that to throw this large block on that market would materially affect it, with the result that a price ranging from $74 to $77 a share would be the best that could be obtained. His testimony was confined entirely to expert expectations as to market performance in connection with an attempt to dispose of this stock; he had no knowledge of the financial condition or business prospects of the Standard Co., nor as to the attitude of its stockholders toward disposing of their holdings.

We cannot believe that the stock of a corporation which had attained outstanding leadership in its field, which, during the five-year period of which we have knowledge from the record before us, had annually earned and distributed as dividends amounts in excess of 20 per centum of the par value of its stock, and which had accumulated a huge surplus, a part of which it planned, at the time here basic, to expend in widespread expansion, was an unwanted stock. To the contrary, we conclude that its owners did not desire to sell it and that likely it would have found a ready and acceptable market had it been offered, even in very substantial amounts. In support of this view we need only point to the fact that during October 1927, a few months after decedent's death, 21,088 shares— nearly two thirds of the amount held by decedent's estate—were sold on the Pittsburgh Exchange at prices considerably in excess of the value used by respondent of which petitioners complain. Certainly, that record indicates that it was possible to market the stock of which decedent died possessed within a reasonable time thereafter, at a price at least equivalent to the valuation fixed by respondent. We conclude that his determination of the fair market value of the stock was not in error.

*Judgment will be entered for the respondent.*