ESTATE OF LEONARD B. McKITTERICK, DECEASED, CORA MADELINE McKITTERICK, EXECUTRIX, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 95024.   Promulgated June 19, 1940.

*Herman E. Riddell, Esq., Donald Agnew, Esq.,* and *N. Philip Bastedo, Esq.,* for the petitioner.

*John R. Wheeler, Esq.,* for the respondent.

132

OPINION.

LEECH: Respondent included in decedent's estate, under the Revenue Act of 1926, section 302, 34,902 shares of Philip Morris stock and 34,780 warrants, at the respective per unit values of $91⅜ and $10⅜, as of August 15, 1936, the date of decedent's death. The stock of this company was listed on the New York Stock Exchange before, during, and after 1936, and the warrants were listed from July 27 to August 17, 1936. The values of decedent's stock and warrants, as determined by respondent, were the mean unit market prices thereof, as reflected by actual sales on that Exchange on the critical date. The first issue involves only the correctness of this determination of value.

The term "value", as used in the cited statutory provision, means "fair market value." *Cecil H. Gamble, Executor*, 33 B. T. A. 94; affd., 101 Fed. (2d) 565; certiorari denied, 306 U. S. 664. This value is a fact, the determination of which is, at least, generally difficult. The result is rarely satisfactory. However, certain rules are helpful in considering the question.

Thus, respondent can not, by regulation or otherwise, limit the evidence to be considered. *Commissioner* v. *Shattuck*, 97 Fed. (2d) 790. All the evidence, bearing on the ultimate fact, must be considered. *Crawford* v. *Helvering*, 70 Fed. (2d) 744; *Heiner* v. *Crosby*, 24 Fed. (2d) 191.

However, in the absence of exceptional circumstances depriving them of or reducing their evidentiary worth, the prices at which stock or warrants are actually traded on an open public market, on the pertinent date, have been held generally to be the best evidence of their fair market value on that date. *John J. Newberry*, 39 B. T. A. 1123; *Frank J. Kier et al., Executors*, 28 B. T. A. 633.

The existence of such exceptional circumstances will not be presumed. It must be established clearly before a determination, supported by such evidence, will be disturbed. *Safe Deposit & Trust Co. of Baltimore, Executor*, 35 B. T. A. 259; affd., 95 Fed. (2d) 806; *Estate of Archibald M. Chisholm*, 37 B. T. A. 167; *Frank J. Kier et al., Executors, supra.*

Here petitioner argues that such exceptional circumstances do obtain. She says (1) the shares and warrants could not have been sold at the prices prevailing on the date of decedent's death; (2) the intrinsic value of the stock should be given more weight here than the market price; and (3) the market price was abnormally high on the date of death by reason of the unusual situation existing at that time.

The first position is, of course, a statement of the so-called blockage rule. The application of this rule is not dogmatic. It is merely one of the exceptions to the rule just stated. Before it may be applied,

the basis therefor must be shown clearly. *Safe Deposit & Trust Co. of Baltimore, Executor, supra.* That basis is that the actual market is so relatively narrow, as compared with the stock or warrants to be valued, as to destroy or seriously affect the weight of the prices in such market as competent evidence of the fact. *Estate of Daniel Guggenheim,* 39 B. T. A. 251; *Helvering* v. *Kimberly,* 97 Fed. (2d) 433; *Commissioner* v. *Shattuck, supra.*

Failure of the record to disclose that the market was so inactive on or about the critical date that it would have been impossible to dispose of the stock and warrants in a reasonably short period of time thereafter, prevents the application of the so-called blockage theory. *John J. Newberry, supra; Frank J. Kier et al., Executors, supra.*

Petitioner introduced the testimony of three expert witnesses, and the respondent the testimony of two such witnesses. Two of these witnesses of petitioner testified that trading would have stopped had the shares and warrants, involved in this proceeding, been offered for sale on August 15, 1936; that it would have taken three to six months to liquidate the block, swollen as it was by the exercise of the warrants, and that such sales would have been impossible except at an average price of from $70 to $75 per share for the stock and comparable prices for the warrants. The third witness of petitioner declined to testify as to the possibility of disposing of the stock. The effect to be given the testimony of these two witnesses is more than a little weakened by the testimony of the witnesses for the respondent, and other evidence in the record. The market for Philip Morris stock was comparatively consistent and active throughout 1936.

Not only were 4,600 shares traded on the date of decedent's death, and 5,900 on the next succeeding market day, but a total of 46,600 shares was bought and sold on the New York Stock Exchange within 40 days after August 15, 1936. That was more than the number of shares included in decedent's block after the exercise of his warrants.

At least one of petitioner's witnesses admitted that he had failed to assume a corresponding addition of buyers to the market when he considered the possibility of disposing of decedent's stock and warrants. See *John J. Newberry, supra.* We therefore conclude that no basis has been established for the application of the blockage rule here.

No basis for the second position of petitioner, to the effect that intrinsic value should supersede market price as the best evidence of fair market value here, has been established. Formulas and evidence probative of intrinsic value are more appropriate to an unlisted stock valuation, than to the case of a listed stock for which there is an active market demand. See *James Couzens,* 11 B. T. A. 1040; *George D. Harter Bank, Executor,* 38 B. T. A. 387; *W. M. Ritter Lumber Co.,*

30 B. T. A. 231, 281; *Frederick A. Koch, Jr., Executor*, 28 B. T. A. 363. The stock and warrants of Philip Morris & Co., Ltd., Inc., were not closely held. The market therefor was public and relatively broad. The testimony of one of petitioner's witnesses disclosed wide discrepancies between "intrinsic" value and market price in the case of the stock of three other companies. It may be assumed that such a discrepancy frequently exists, but such a discrepancy does not, in the present circumstances, warrant ignoring the market price as the best evidence of fair market value. *Cecil H. Gamble, Executor, supra; Eleanor Lansburgh, Administratrix*, 35 B. T. A. 928. It may be irrational for buyers on the stock market to pay more for a stock than the per share value of the underlying corporate assets, but we are concerned only with what that stock will fetch on such a market even though it be irrational. *Ithaca Trust Co. v. United States*, 279 U. S. 151.

The third argument for petitioner, which it is said justifies the re jection of the fair market price of this stock and the warrants as the best evidence of their fair market value on the critical date, is likewise without merit.

It is true that the market for Philip Morris stock was affected by adventitious factors, namely, a favorable annual report, the issuance of warrants to buy for $50 stock selling at $90, and the announcement of an increased dividend rate. But the presence of such factors would seem to be nothing more than valid reasons for the upswing in this stock's value at the middle of the year. There was some testimony to the effect that the success of Philip Morris was due mainly to the personality and efforts of decedent, and that his death robbed the stock of considerable of its value. There was other evidence, however, tending to show that the company was well enough organized to be able to carry on without decedent, and its subsequent history as disclosed, in its balance sheet and earnings statements for the fiscal year ended March 31, 1937, shows this latter evidence to be true. The market price, moreover, remained fairly level for a month and a half following McKitterick's death, serving to indicate the lack of any marked unfavorable reaction to the loss of his services.

Witnesses for both sides agreed that there was no evidence of market manipulation on or around the critical date, although one "had a feeling" that the market was being supported. Petitioner, in an attempt to prove manipulation, introduced a record of a proceeding brought by the Securities and Exchange Commission against one Schulte, charging manipulation of the market in several stocks, Philip Morris among them. An examination of that record discloses averments of manipulative practices in 1938, but there is nothing to show manipulation in 1936.

We have considered the entire record, including the expert testimony and the financial record and history of Philip Morris. It was a successful and growing company, engaged in the manufacture and sale of a product for which there was a firm and increasing demand. The demand was stimulated by conservative, nonspectacular promotion methods. The financial position of the company in 1936 seems to us to have been thoroughly sound, the need for new financing arising from a healthy increase in inventory requirements rather than from a lessening of profits. Earnings were increasing. The market was exceptionally but not unreasonably active in the circumstances. On the basis of all the evidence, we think the record fails to disclose error in respondent's determination of values for the stock and warrants.

In determining the deficiency, respondent included in decedent's gross estate the amounts paid to the petitioner, as executrix, by Philip Morris in 1937, on the ground that decedent owned the right on the date of his death to the percentage of the profits specified in the bonus contract then in effect, adjusted to that date. The second issue is raised by petitioner's challenge to the propriety of this action.

Undoubtedly decedent could have made such a contract with Philip Morris as would not have created a legal liability on its part to pay a bonus to decedent's estate for the period in the taxable year prior to his death. *United States Trust Co. of New York et al., Executors*, 9 B. T. A. 514. The question is, Did they do so here? We think not. Of course, the intention of the parties to the contract, evidenced by the corporate resolution referred to, controls. And that intention must be gathered from the resolution itself, as concurrently construed by the parties, together with the attendant circumstances. *Barnett* v. *West Construction Co.*, 69 Fed. (2d) 266; *Federal Surety Co.* v. *Bentley & Sons Co.*, 51 Fed. (2d) 24.

Petitioner contends that, since the corporate resolution of June 20, 1933, provided that a computation be made of the net profits after the close of the year and since the contract thus established was to be in effect only during decedent's service as president, his death at any time before the date set for computing the amount payable thereunder would relieve the corporation from legal liability to compute and pay any bonus.

We do not agree with this view. The resolution mentioned provided that the bonus should be paid "for so long as L. B. McKitterick shall be President of the Corporation." McKitterick held that office from the first day of 1936 until his death on August 15 of that year. During that period he performed the services for which his salary and bonus were to be paid. Unless the evidence shows a contrary intent, it would seem that the liability of the company to pay both,

in the present circumstances, was the same. Here, no such opposite intent is revealed. Cf. *United States Trust Co., Executor, supra.* In fact, the amount of his bonus, reasonably to be anticipated, was many times the amount of the salary and probably was the main inducement by which the services of decedent were secured.

The company, itself, construed the concurrent right of the decedent as thus fixed. The corporation, upon the close of the year of decedent's death, by resolution directed the payment to his estate of the proportion of net earnings for the year, provided by the contract, allocable to that portion of the year during which he had lived and rendered services, entered this payment on its books as due the decedent on account of the bonus, and deducted it as the payment of an ordinary and necessary expense in its return for that year.

The disputed payment to decedent's estate was due and owing on account of the bonus for the part of the year preceding his death or it was a gift. A *sine qua non* of a gift is donative intent on the part of the payor. *Theodore C. Jackson et al., Administrators,* 32 B. T. A. 470. And that intent will not be presumed. Inconsistency with any other intention must appear. In short, the intent of the donor to make a gift must be shown unmistakably. *Edson v. Lucas,* 40 Fed. (2d) 398; *Moore v. Tiller,* 61 Fed. (2d) 478; *Gannon v. McGuire,* 160 N. Y. 476; 55 N. E. 7; *Guaranty Trust Co. of New York et al., Executors,* 35 B. T. A. 916; aff'd., 98 Fed. (2d) 62. Here the record discloses the actual payment of the money by the company to decedent's estate. But that fact does not characterize such payments as a gift. The corporate treatment of these payments, wholly inconsistent with the gift theory, supplemented by the absence of any provision in the resolution of June 20, 1933, releasing the company from liability to pay the bonus for any year during which decedent died, or any indication in the resolution of December 18, 1936, characterizing the payments as gifts, not only fails to establish that these payments were intended as gifts and the respondent's determination, therefore, was in error, but it supports the premise upon which the respondent included the contested payments in decedent's estate. See *United States Trust Co., Executor, supra.*

Decedent under the existing arrangement was rendering service for a stated yearly salary plus a certain percentage of the year's profits. He died after rendering service for seven and one-half months of the year. The corporation had received the benefit of his service for that period. To avoid such liability it would have to be definitely established that the understanding was that decedent must live and serve through the year to be entitled to any payment of bonus. See *United States Trust Co., Executor, supra.* It was not so established.

We hold that upon decedent's death his estate possessed the right to exact of Philip Morris that proportion of the percentage of net

profits of the corporation for the year designated in the bonus resolution of June 20, 1933, as payable to decedent, allocable to the period January 1 to August 15. Having reached this conclusion, the question is ruled by our recent decision in *Estate of G. Percy McGlue*, 41 B. T. A. 1199. Respondent has included this right in decedent's estate at a value of $134,513.38. No issue has been raised with respect to the computation of this amount nor has a lesser value for the right been shown. Consequently, respondent is affirmed on this issue.

Petitioner has claimed a number of additional deductions on account of ordinary and necessary administration expenses, and the amounts and character thereof have been stipulated. Respondent does not oppose these deductions on brief. They are all allowable under section 303 (a) (1) of the Revenue Act of 1926, and will be so considered in the recomputation under Rule 50.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

BLACK, dissenting: I respectfully dissent from the majority opinion because I believe that the valuation placed by the Commissioner on the Philip Morris common stock is too high. The executrix of the estate of decedent returned the valuations on the estate tax return at $71 per share for the Philip Morris common stock. The Commissioner increased these valuations to $91.375 for each share of common stock. The majority opinion sustains the Commissioner in the values which he has determined.

While I think that the values on this Philip Morris common stock returned by the executrix on the estate tax return filed by her are, in the light of the evidence, too low, on the other hand I think the valuations fixed by the Commissioner and sustained by the Board are too high. Manifestly so large a block of stock as that owned by decedent on the day of his death, to wit, 34,902 shares, could not have been marketed on August 15 for $91.375 per share. I am convinced from the evidence that any attempt to have marketed that large a block of stock, on the basic date or any date thereabout, would have resulted in a much lower figure than $91.375. But it is of course true that no prudent executrix would attempt to market such a large block of stock in one day. Presumably, if selling is required, she would take a reasonable length of time in which to market so large a block of stock, and when this factor of valuation is taken into consideration, viewed in the light of the price range of the stock which existed after decedent's death, it is difficult for me to see where the Commissioner's valuation can be sustained. Considerably lower figures, I think, would be more in accord with the facts.

STERNHAGEN, dissenting: I reach the same conclusion as my brother Black, but only upon the ground that the evidence indicates that the entire block of shares could not have been sold on that date for the market price per share, and not because of the recognition that in the nature of things a large block as a rule fetches less than the aggregate value of its units. Whether it does or not is a matter of evidence and not of rule. *Helvering* v. *Safe Deposit & Trust Co. of Baltimore*, 95 Fed. (2d) 806; *Estate of Archibald M. Chisholm*, 37 B. T. A. 167. The evidence here I think supports a lower value.