*Decisions will be entered under Rule 50.*

ESTATE OF CHARLES M. PRELL, SR., DECEASED, CHARLES M. PRELL, JR., AND HELEN M. PRELL, CO-EXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2577–64.    Filed April 26, 1967.

*John E. Forrester* and *Ralph D. Kovanda*, for the petitioner.
*Erwin L. Stuller*, for the respondent.

WITHEY, *Judge:* An estate tax deficiency has been determined by respondent against petitioner in the amount of $220,932.93. The issues to be decided are (1) what is the correct valuation date for certain shares of stock which were assets of decedent's estate, (2) what was the fair market value thereof on one valuation date, (3) whether decedent transferred $8,240 to his son and daughter prior to his death, and (4) what is the proper attorney's fee allowance to petitioner as an administration expense. Another issue raised by the pleadings, the

amount of the marital deduction, is necessarily dependent upon the disposition of issues 1 through 4 and will be given effect under Rule 50.

### GENERAL FINDINGS OF FACT

The facts which have been agreed upon are found as stipulated.

Charles M. Prell, Sr., hereinafter referred to as the decedent, died March 31, 1960, a resident of Strongsville, Ohio. The Federal estate tax return of the Estate of Charles M. Prell, Sr., hereinafter referred to as the estate, was filed with the district director of internal revenue, Cleveland, Ohio, on June 29, 1961. The return indicated a gross estate of $5,434,746.41 at the time of decedent's death.

On April 5, 1960, the will of the decedent was admitted to probate in the Probate Court of Cuyahoga County, Ohio, and Charles M. Prell, Jr., and Helen M. Prell were appointed coexecutors of the estate.

The residuary legatees of the estate and their interests under decedent's will are as follows:

| Name | Relationship to decedent | Percentage of the residue of the estate |
|---|---|---|
| Mary B. Prell | Wife | 50 |
| Charles M. Prell, Jr | Son | 25 |
| Helen M. Prell | Daughter | 25 |

### *Issue 1*

#### FINDINGS OF FACT

On the date of decedent's death he owned, among other assets, 100,624 shares of stock in the Standard Pressed Steel Co., hereinafter Standard. On August 9, 1960, the executors of decedent's estate assigned and delivered to the residuary legatees 100,000 shares of Standard stock as follows: 50,000 shares to decedent's spouse; 25,000 shares to decedent's son; and 25,000 shares to decedent's daughter. On the same day the legatees signed receipts for the stock and the stock certificates were delivered to a local stock brokerage house for forwarding to Standard. On August 15, 1960, Standard transferred ownership of the stock on its stock transfer books and issued new certificates to the legatees.

Decedent's Federal estate tax return, filed on June 29, 1961, indicated an election to use alternate valuation dates in valuing decedent's gross estate. As indicated in the return, the date chosen by the executors to reflect the distribution of the 100,000 shares of Standard stock was August 9, 1960.

The Standard stock assigned and delivered to the three legatees was effectively separated from the estate on August 9, 1960, and was, in fact, distributed and paid over to them on that date.

OPINION

The statute which indicates the proper date for estate tax valuation in view of petitioner's election of an alternate date is section 2032(a)(1),[1] I.R.C. 1954. The regulation which has been promulgated in pursuance thereof is section 20.2032–1(a)(1) and (c)(2)(i), (ii), and (iii), Estate Tax Regs.[2]

On August 9, 1960, the executors of decedant's estate endorsed 100,000 shares of Standard stock, obtained receipts from the residuary legatees acknowledging delivery therefor, and had the stock sent to Standard for the purpose of changing the record ownership of the shares on the corporate books from decedent's name to those of the legatees. We think the executors, consistent with the language of the pertinent estate tax regulation, sec. 20.2032–1, effectuated a "segregation or separation of the property from the estate * * * so that it * * * [became] unqualifiedly subject to the demand or disposition of the distributee[s]" and that such action by the executors constituted an "actual paying over or delivery of the property to the distributee[s]."

While the executors do not challenge the validity of the pertinent regulation, they take the position that under Ohio probate law, Ohio Rev. Code Ann., sec. 2113.53 (Page 1953), an executor may not distribute assets of the estate until certain conditions have been met, one of which is the expiration of 6 months from the date of the executor's appointment. Thus, they argue that the first date the Standard stock could have been legally delivered to the legatees herein was October 5,

---

[1] SEC. 2032. ALTERNATE VALUATION.

(a) GENERAL.—The value of the gross estate may be determined, if the executor so elects, by valuing all the property included in the gross estate as follows:

(1) In the case of property distributed, sold, exchanged, or otherwise disposed of, within 1 year after the decedent's death such property shall be valued as of the date of distribution, sale, exchange, or other disposition.

[2] Estate Tax Regs.

Sec. 20.2032–1 Alternate valuation.

(a) *In general.* In general, section 2032 provides for the valuation of a decedent's gross estate at a date other than the date of the decedent's death. More specifically, if an executor elects the alternate valuation method under section 2032, the property included in the decedent's gross estate on the date of his death is valued as of whichever of the following dates is applicable:

(1) Any property distributed, sold, exchanged, or otherwise disposed of within one year after the decedent's death is valued as of the date on which it is first distributed, sold, exchanged, or otherwise disposed of;

\* \* \* \* \* \* \*

(c) *Meaning of "distributed, sold, exchanged, or otherwise disposed of".* * * *

(2) Property may be "distributed" either by the executor, or by a trustee of property included in the gross estate under sections 2035 through 2038, or section 2041. Property is considered as "distributed" upon the first to occur of the following:

(i) The entry of an order or decree of distribution, if the order or decree subsequently becomes final;

(ii) The segregation or separation of the property from the estate or trust so that it becomes unqualifiedly subject to the demand or disposition of the distributee; or

(iii) The actual paying over or delivery of the property to the distributee.

1960, 6 months after the executors were appointed. In rejecting this contention we are satisfied that the Ohio statute relied upon is primarily intended to protect claimants of the estate. See *In re Estate of Walden*, 6 Ohio Misc. 214, 214 N.E. 2d 271 (Prob. Ct. 1965). The record herein not only fails to disclose the existence of any such claimants but fails to disclose the likelihood of any action, present or prospective, against the estate by any claimant. The word "distribution," as used in section 2032 of the Code and as defined in the regulation quoted in the margin, relates to the shifting of the economic benefits of the property transferred, *Hertsche* v. *United States*, 244 F. Supp. 347 (D. Ore. 1965), rather than with technicalities of State law. We think the controlling Federal law is intended to deal with the actuality of distribution or the paying over of an asset in an estate. We have found as a fact that this occurred on August 9, 1960, the valuation date designated in petitioner's estate tax return, and therefore find the valuation date to be August 9, 1960.

## Issue 2

### FINDINGS OF FACT

The market price of standard stock had been declining since the end of 1959. On August 9, 1960, the over-the-counter bid price of the stock was $27 and the asked price was $29¾ or a mean of $28.375. The total outstanding stock of Standard on that date was about 2,500,000 shares.

In the opinion of an investment banker, hereinafter the banker, whose firm was experienced in the business of acting as underwriter in the disposition of blocks of stock through secondary offerings upon the over-the-counter market, 100,000 shares of Standard stock could not have been disposed of on the market on August 9, 1960, the alternate valuation date, since the bidding for such stock was not in sufficiently large quantities. The banker felt that in order to sell such a large block of Standard stock it would be necessary to first sell the stock to an underwriting group who would, in turn, make a reoffering of the stock. The banker concluded that if a 100,000-share block of Standard stock had been disposed of in this manner, the seller would have received, after all expenses, approximately $24 a share.

At or about the end of 1959, one Joseph Fribley died. He, together with his family, held "286,000 plus" shares of Standard stock at that time. Subsequently, on December 6, 1960, the banker's firm offered 115,760 shares of Standard stock for sale to the public. The block was composed of shares formerly held by the Prell and Fribley estates. The immediate result of the sale was a rise in the price of Standard stock on the over-the-counter market.

Decedent's executors elected August 9, 1960, as the alternate valuation date for determining the value of the 100,000 shares of Standard

stock distributed to the residuary legatees. From a total valuation of $2,700,000 for such stock, or $27 per share, there was claimed on the estate tax return a deduction of $251,006 as "blockage." In his notice of deficiency, respondent disallowed the claimed blockage discount and determined a fair market value for the stock in question using August 15, 1960, as the alternate valuation date.

The sale of 100,000 shares of Standard stock within a reasonable period beginning with the valuation date of August 9, 1960, would not have depressed the market therefor. The per share fair market value thereof on August 9, 1960, was $28.375.

OPINION

Petitioner takes the position that in arriving at the fair market value of the 100,000 shares of Standard stock distributed to the residuary legatees, it is entitled to a discount for "blockage" in the amount of $251,006.

Having gleaned from this record all the material and relevant facts, we find a striking paucity of facts upon which an adjustment for blockage may be allowed. The burden of proof here is squarely upon the petitioner. It has failed to sustain that burden.

The so-called blockage allowance has for some time been the subject of a regulation of respondent. The regulation, sec. 20.2031-2(e), Estate Tax Regs., provides, in part, that—

Where sales at or near the date of death are few or of a sporadic nature, such sales alone may not indicate fair market value. In certain exceptional cases, the size of the block of stock to be valued in relation to the number of shares changing hands in sales may be relevant in determining whether selling prices reflect the fair market value of the block of stock to be valued. If the executor can show that the block of stock to be valued is so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market, the price at which the block could be sold as such outside the usual market, as through an underwriter, may be a more accurate indication of value than market quotations. * * *

We have very little direct proof of the market conditions relating to dealings in Standard stock. We do have the conclusory opinion of petitioner's witness, an investment banker, that the block of stock in controversy was large in comparison to the market bids therefor and thus could not have been disposed of at the market on August 9, 1960. However, we cannot give much weight to that opinion inasmuch as the foundation upon which it rests is unsupported by the record. We note also that the witness was in the business of underwriting the sale of blocks of stock and that his opinion as to the proper method of selling the stock in question is to be viewed in the light of that fact.

Petitioner has not convinced us that the mean of the market quotations on the valuation date is not a better indication of the fair market

value of the stock than the price at which it could be sold to underwriters.

Petitioner has likewise failed to demonstrate the number of sales of this stock on the over-the-counter market. We have no way of knowing, but it well might be that the number was sufficiently large to indicate readily available purchasers for this stock. In the absence of such evidence, we must conclude that fact to be true. As was stated in *Estate of Leonard B. McKitterick*, 42 B.T.A. 130, 137 (1940)—

> Failure of the record to disclose that the market was so inactive on or about the critical date [valuation date] that it would have been impossible to dispose of the stock * * * in a reasonably short period of time thereafter, prevents the application of the so-called blockage theory. * * *

Petitioner has likewise failed to favor us with any evidence relating to the condition of the corporation which was the issuer of the stock in question. We are not advised as to its worth, its present, past, or prospective earnings. In short, this record leaves us with only the quoted over-the-counter bid and asked prices upon which to make our determination of the value of the stock in controversy.

Upon the record before us we conclude that the fair market value of the block of 100,000 shares of Standard Pressed Steel Co. stock distributed by petitioner on August 9, 1960, was that price which a skilled broker could obtain by disposal of the stock over a reasonable period beginning with and subsequent to the valuation date. *Estate of Leonard B. McKitterick, supra; Frank J. Kier, et al., Executors*, 28 B.T.A. 633 (1933). We have found as a fact that, so viewed, the value per share of the stock in controversy was $28.375 on August 9, 1960.

*Issue 3*

### FINDINGS OF FACT

By a check dated September 22, 1959, decedent made a gift to his son and daughter in the amount of $8,240. The check was deposited in late September 1959. Decedent died on March 31, 1960.

### OPINION

In his deficiency notice, respondent determined, pursuant to section 2031(a) of the Code, that the amount of $8,240 was includable in the value of decedent's gross estate inasmuch as there was no evidence that such an amount had been transferred prior to decedent's death. Inasmuch as the parties have subsequently stipulated that a check in the foregoing amount was actually issued by decedent on September 22, 1959, and cashed soon thereafter, all taking place approximately 6 months prior to decedent's death, this issue is resolved in favor of petitioner.

*Issue 4*

FINDINGS OF FACT

On decedent's estate tax return the executors claimed, as a deduction from the value of the gross estate, attorney's fees in the amount of $110,000, of which $40,000 had been approved by the Probate Court of Cuyahoga County, Ohio, at the time the return was filed with respondent on June 29, 1961. As of March 23, 1964, the date of the deficiency notice, the Probate Court had allowed attorney's fees of $95,000. The deficiency notice allowed only $95,000 of the $110,000 attorney's fee deduction claimed on the return, on the ground that the executors had failed to furnish "evidence of payment of attorneys fees in excess of $95,000." By the time the deficiency notice was issued, the executors had instituted a proceeding in the Ohio Probate Court to contest the reasonableness of additional attorney's fees claimed by the attorney who had already received $95,000. That proceeding resulted in a settlement by which the attorney was awarded an additional $20,000. As of the time of trial, the estate had paid $11,935.40, in addition to the foregoing $115,000, and had agreed to pay another $15,000 for the closing of the estate, resulting in total attorney's fees of $141,935.40.

OPINION

Section 2053 (a) (2) of the Code permits an estate to deduct from the value of the gross estate, in determining the value of the taxable estate, those administrative expenses which are allowable by the laws of the jurisdiction under which the estate is being administered. Section 20.2053–3 (a), Estate Tax Regs., includes attorney's fees within the meaning of administrative expenses. Section 20.2053–3 (c) (1), Estate Tax Regs., provides:

(c) *Attorney's fees.* (1) The executor or administrator, in filing the estate tax return, may deduct such an amount of attorney's fees as has actually been paid, or an amount which at the time of filing may reasonably be expected to be paid. *If on the final audit of a return the fees claimed have not been awarded by the proper court and paid, the deduction will, nevertheless, be allowed, if the district director is reasonably satisfied that the amount claimed will be paid and that it does not exceed a reasonable remuneration for the services rendered, taking into account the size and character of the estate and the local law and practice.* If the deduction is disallowed in whole or in part on final audit, the disallowance will be subject to modification as the facts may later require. [Emphasis supplied.]

Pursuant to the regulation set out above, respondent may have been justified, at the time the deficiency notice was issued, in denying that part of the claimed attorney's fee in excess of $95,000 since at that time the Ohio Probate Court had allowed attorney's fees of only

$95,000 and had before it a proceeding which challenged the reasonableness of an additional attorney's fee filed against the estate. That being the case, respondent could not, consistent with the language in the regulation, have been—

reasonably satisfied that the amount claimed [$110,000] * * * [would] be paid and that it * * * [did] not exceed a reasonable remuneration for the services rendered * * *

While respondent's position may have been justified by the facts existing at the time his deficiency notice was issued, we do not think such a position was justified as of the time of trial. We have found that the estate instituted a proceeding to contest attorney's fees claimed in excess of the $95,000 allowed by the Probate Court. Inasmuch as that contest resulted in a settlement prior to the time of trial and the parties have stipulated that the estate actually paid attorney's fees of $126,-935.40 as of the time of trial, we are satisfied that the amount actually paid is reasonable and therefore deductible by the estate as an administrative expense. As to the final $15,000 attorney's fee, which as of the time of trial the executors had agreed to pay for closing the estate but which had not yet been paid, closer scrutiny is required.

Pursuant to the regulation above-cited, allowance of a deduction for attorney's fees is not dependent upon actual payment or even approval of the Probate Court, provided—

the district director is reasonably satisfied that the amount claimed will be paid and that it does not exceed a reasonable remuneration for the services rendered, taking into account the size and character of the estate and the local law and practice. * * *

The record amply supports the probability of payment inasmuch as the executors agreed with counsel to a specific fee for closing the estate and there is no evidence that the estate lacked adequate funds to make such payment. With regard to the question of reasonableness, there is no positive rule which we can rely on for this determination since each case rests on its own facts. Some of the factors most often relied upon by the courts when considering the reasonableness of attorney's fees in estate cases are the size and nature of the estate, *Estate of Charlotte D. M. Cardeza*, 5 T.C. 202, 221 (1945), affd. 173 F. 2d 19 (1949); *Irving Bank-Columbia Trust Co., et al., Executors*, 16 B.T.A. 897, 906 (1929), the amount of work involved, *Estate of E. W. Hunt*, 11 T.C. 984, 992 (1948), actual and contemplated litigation, *Estate of E. W. Hunt, supra, Irving Bank-Columbia Trust Co., et al., Executors, supra*, and the length of time the estate was under administration, *Irving Bank-Columbia Trust Co., et al., Executors, supra*.

While we are without sufficient evidence to apply all the foregoing criteria to the instant situation, we think it significant that the value of decedent's gross estate at the time of his death was almost $5½

million. Considering the amount of time and effort which might reasonably be required to close an estate of that size, we cannot say that an attorney's fee of $15,000 is so large as to be unreasonable. We think our determination of reasonableness is further supported by the fact that the executors had agreed to the attorney's fee in question as of the time of trial. We therefore hold that petitioner is entitled to deduct, as an administrative expense, the total attorney's fees in question of $141,935.40.

*Decision will be entered under Rule 50.*