SOLOMON I. and BEATRICE KAPLAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kaplan v. Commissioner
Docket No. 8203-71.
United States Tax Court
T.C. Memo 1974-29; 1974 Tax Ct. Memo LEXIS 289; 33 T.C.M. (CCH) 131; T.C.M. (RIA) 74029; January 31, 1974, Filed. *289 P purchased stock of S corporation, by whom he had been employed for 28 years, and of a corporation related to S through indentity of ownership. The respondent determined that P had been allowed to purchase such stock for less than its fair market value because of the employment relationship and that he thereby realized additional compensation. Held, the stock was not sold to P at a "bargain" price. Francis J. DiMento, for the petitioners.
Willard J. Frank, for the respondent. 2 SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION
SIMPSON, Judge: The respondent determined the following deficiencies in the Federal income tax of the petitioners: Year
Deficiency 1966
$50,410.88
1967
2,569.31
1968
910.00 Certain issues have been settled, and the one issue which remains for decision is whether Solomon I. Kaplan received additional compensation as a result of an alleged bargain purchase of stock of his corporate employers.
FINDINGS OF FACT
Some of the facts have been stipulated, and those facts are so found.
The petitioners, Solomon I. Kaplan and Beatrice Kaplan, are husband and wife, who maintained their residence in Boston, Massachusetts, at the time their petition was filed in this case. *290 They reported income in accordance with the cash method of accounting and filed their Federal income tax returns for the years 1966, 1967, and 1968 with the district director of internal revenue, Boston, Massachusetts. Solomon I. Kaplan will be referred to as the petitioner. 3 In 1966, the petitioner was an employee and officer *291 of the H. Scheft Company (Scheft Co.). That company sold shoes at retail, principally in space leased from department stores, but it also had some separate retail stores. In 1961, the owners of the Scheft Co. purchased the Stone Shoe Company (Stone Co.), which operated a group of retail shoe stores located in the areas of Akron and Cleveland, Ohio. At all times relevant prior to January 20, 1966, the stock of the Scheft and Stone companies was owned by William Scheft, Theodore Scheft, and Eleanor and Elmer Rigelhaupt, who were the children and son-in-law of the founder of the Scheft Co., and who will sometimes be referred to collectively as the Scheft family. William Scheft was the president of both the Scheft Co. and the Stone Co.
In August 1965, the petitioner, who had been an employee of the Scheft Co. for approximately 27 years and who was then 50 years of age, stated to William Scheft that, as the culmination of his career with the Scheft Co., he wanted to purchase an equity interest in both the Scheft and Stone companies. The petitioner had discussions with members of the Scheft family as to the amount of stock to be sold to him and the price to be paid for such stock. *292 The Scheft family decided that because of the petitioner's long and valuable services for the 4 corporation, 5 percent of the stock of each of the companies would be sold to him; no stock would have been sold to him were it not for such services. In fixing the price to be paid for the stock, they sought a price which would be fair to both parties. The petitioner's accountant advised him that a reasonable price would be approximately $72,000, and by September 1965, both the petitioner and the members of the Scheft family agreed upon the sale at a price of $72,794.
The completion of the sale was delayed while the attorneys worked out the provisions of the sales contract. The final contract provided that the corporations should repurchase the petitioner's stock at its book value upon his death, his retirement at age 60, or the termination of his employment by either of the corporations. The petitioner had the right to sell his stock, but he had to give the corporations a right of refusal under which they could purchase the stock for a period of 10 days at the price offered by the prospective purchaser. On January 20, 1966, the purchase was consummated. The petitioner purchased *293 36 shares of common stock of the Scheft Co. for $64,836 and 16-1/2 shares of common stock of the Stone Co. for $7,958. 5 Both the Scheft Co. and the Stone Co. maintained their books and records on the basis of a fiscal year ending January 31. According to its tax returns for the taxable years ending January 31, 1963, through January 31, 1965, the Scheft Co. had after-tax earnings in the following amounts: Year Ending
After-tax Earnings 1963
$ 98,547.00
1964
104,998.00
1965
186,577.00
The Stone Co., which reported substantial operating losses for the years ending in 1960, 1961, and 1962, carried over such losses to the years ending in 1963, 1964, and 1965, and reported no income tax due in such years even though it reported taxable income before net operating loss deductions in the following amounts: Year Ending
Taxable Income Before Net Operating Loss Deduction 1963
$ 18,762.99
1964
44,242.46
1965
72,056.00
At the time the Scheft Co. issued stock to the petitioner, it represented to him that the difference between the assets and liabilities as shown on its books and records as of January 31, 1965, was $1,843,782.58. Similarly, *294 the Stone Co. advised the petitioner at the time it issued stock to him that the difference between 6 the assets and liabilities as shown on its books and records as of January 31, 1965, was $227,177.77. Both the Scheft and Stone companies had a history of not paying dividends, and at the time of the agreement to purchase the stock, there was no expectation that dividends would be paid.
On August 18, 1966, the Green Shoe Manufacturing Company (Green Co.) acquired the outstanding common stock of both the Scheft and Stone companies in a transaction which qualified under section 368(a) (1) (B) of the Internal Revenue Code of 1954. [1] The Green Co. was engaged in the production of children's shoes and was interested in expanding into the market of shoes for men and women. It acquired the Scheft and Stone companies, which had been substantial customers, to spearhead the planned expansion. In furtherance of such plan, the petitioner and William Scheft were signed to 5-year employment contracts with the Scheft and Stone companies, and the petitioner signed a covenant not to compete for 1 year in the event he left the employ of the companies.
*295 The parties to the acquisition agreed upon a combined value of approximately $2.8 million for both companies. 7 They arrived at such figure by capitalizing the combined earnings of the companies as of January 31, 1966, after making certain adjustments in such income. Specifically, the parties adjusted for a decrease in the salary of Theodore Scheft, the elimination of the salary paid Elmer Rigelhaupt, and savings attributable to the consolidation of operations, such as rent, telephone, and professional services. The earnings as reconstructed amounted to between $250,000 and $264,000, and the parties capitalized such earnings by 11. No discount was made for the nonmarketable nature of the stock.
On August 18, 1966, the petitioner received 1,497 shares of common stock in the Green Co. in exchange for the common stock he owned in the Stone Co., and he received 6,012 shares of common stock in the Green Co. in exchange for his common stock in the Scheft Co. On the date of such exchange, the price at which the common stock of the Green Co. was traded on the New York Stock Exchange ranged from $19-1/8 to $19-1/2 per share, and the price at which 7,509 shares of common stock in *296 the Green Co. could be purchased ranged between $143,609.63 and $146,425.50.
Subsequently, the Green Co. sold the Scheft and Stone companies for a price approximately equal to what it paid for them. 8 In the notice of deficiency, the respondent determined that the petitioner had been allowed to purchase the Scheft and Stone stock for less than its fair market value and that he thereby realized additional compensation.
OPINION
Section 61(a) provides a general definition of the term "gross income":
Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including * * *:
(1) compensation for services * * * That definition is amplified by section 1.61-2(d) (2) (i) of the Income Tax Regulations, which provides, with certain exceptions not applicable to the proceedings herein, that:
if property is transferred by an employer to an employee * * * as compensation for services for an amount less than its fair market value, then regardless of whether the transfer is in the form of a sale or exchange, the difference *297 between the amount paid for the property and the amount of its fair market value at the time of the transfer is compensation and shall be included in the gross income of the employee * * *
Commissioner v. LoBue, 351 U.S. 243 (1956); William H. Husted, 47 T.C. 664 (1967). The respondent takes the position that the fair market value of the stock in the Scheft and Stone companies acquired by the petitioner 9 exceeded what he paid for it and that the petitioner was allowed to purchase the stock at a bargain because of his years of employment for those companies; thus, he contends that the excess represents additional compensation received by the petitioner. On the other hand, the petitioner contends that he paid full value for the stock. Hence, we must decide what was the fair market value of the Scheft and Stone stock when the petitioner acquired it.
It has frequently been stated that valuation is a question of fact that, by its very nature, must be a judicial approximation of what a willing buyer would pay a willing seller, where neither party acts under compulsion *298 and where both parties have knowledge of the facts. Anderson v. Commissioner, 250 F.2d 242, 249 (C.A. 5, 1957), affg. on this issue a Memorandum Opinion of this Court, cert. denied 356 U.S. 950 (1958); Fitts' Estate v. Commissioner, 237 F.2d 729 (C.A. 8, 1956), affg. a Memorandum Opinion of this Court; Righter v. United States, 439 F.2d 1204, 1218 (Ct. Cl. 1971). Generally, the price at which stock is bought and sold in an open market is the best evidence of sale, providing such sales are not made under peculiar or unusual circumstances. Fitts' Estate v. Commissioner, supra at 731; Augustus E. Staley, 41 B.T.A. 752, 769 (1940); John J. Newberry, 39 10 B.T.A. 1123, 1129 (1939); compare White Farm Equipment Company, 61 T.C. (Nov. 14, 1973). However, there is no single formula universally applicable to measure fair market value. Central Trust Company v. United States, 305 F.2d 393, 411 (Ct. Cl. 1962); Richard R. Riss, Sr., 56 T.C. 388, 429-431 (1971), rehearing on another issue 57 T.C. 469 (1971). Where evidence does not exist of an open market for stock, *299 the Court is to consider all factors in the record which have a reasonable bearing on value, including earnings, dividend record, dividend-paying capacity, book value, market price of stocks of corporations in the same or similar line of business, business prospects of the corporation, and the character of management. Arc Realty Company v. Commissioner, 295 F.2d 98, 103 (C.A. 8, 1961), affg. on this issue 34 T.C. 484 (1960); Heiner v. Crosby, 24 F.2d 191 (C.A. 3, 1928); Righter v. United States, supra at 1218; Augustus E. Staley, supra at 769; Drybrough v. United States, 208 F. Supp. 279 (W.D. Ky. 1962); see also Rev. Rul. 59-60, 1959-1 C.B. 237.
In support of his position as to the value of the Scheft and Stone stock, the petitioner presented testimony of two expert witnesses. The first witness was the accountant whom the petitioner consulted prior to the purchase of the stock. The witness had practiced public 11 accounting since 1940, was certified in 3 States, and claimed to have valued the stock of between 100 and 150 closely held corporations during the course of his accounting *300 career. He testified that he capitalized the earnings to determine fair market value. He apparently used the earnings after Federal income tax for the year ending January 31, 1965 [2] - the most current figures available - and capitalized such earnings by a multiple of 8, discounted the result by 20 percent, and arrived at a valuation in excess of $72,000. He explained that the earnings of both the Stone and Scheft companies increased during the 5-year period immediately preceding the sale and that the most current earnings more accurately reflected the value of such companies than did the average earnings over that period. He also explained that stock in some of the publicly traded companies in the same business were selling for between 9 and 10 times their earnings, but that because the Scheft and Stone companies were 12 privately held, he considered an earnings multiple of 8 to be appropriate. Finally, he explained that because the petitioner was purchasing a minority interest, the value should be discounted by 20 percent.
*301 The petitioner's second witness was an accountant who had served as an agent for the respondent from 1963 through 1967. He testified that he applied the valuation formula approved in Central Trust Company v. United States, supra, and determined a fair market value of $63,400 for the stock acquired by the petitioner. Specifically, he found the earnings to be $150,000 - computed by applying a weighted average to the earnings reported by the Scheft Co. for the fiscal years ending in 1962 through 1966 - to which he applied an earnings multiple of 10 and gave the result a 50-percent weight in his calculations. Next, he determined that the Scheft Co. paid no dividends during the period, and gave the absence of dividends a 30-percent weight. Then, he determined from a financial report that the book value of the company as of January 31, 1966, was $2,084,158, and gave such figure a 20-percent weight. Finally, he discounted the result by 10 percent, and arrived at a fair market value of approximately $1,460 per share. He applied the same formula to the weighted earnings, dividends, and book value of the Stone Co., discounted the result by 10 percent, and 13 determined *302 that the fair market value per share of its stock was approximately $665. He then checked his conclusion through use of various other formulas. Initially, he checked fair market value by capitalizing the average earnings over a 5-year period by use of a multiple of 10 and by discounting the result by 30 percent for nonmarketability. He then followed the same formula but applied it to a weighted average of earnings over a 5-year period. Finally, he calculated fair market value by assigning a 50-percent weight to capitalized earnings - using first weighted and then unweighted earnings multiplied by 10 - and assigning a 50-percent weight to book value; the result was then discounted by 30 percent. In each instance, but for one, the witness determined that the purchase price exceeded fair market value.
The respondent argues that little weight should be given to the testimony of the petitioner's witnesses because they were not disinterested, but he has not raised any questions as to the figures and formulas used by them. He bases his valuation solely on the value of the Green Co. stock received in exchange for the Scheft and Stone stock. In the notice of deficiency, he computed the *303 value of the Green Co. stock by reference to the average price of such stock over a 6-month period, but on brief, he takes the position that the value of such stock should 14 be based on its prices on August 18, 1966, the date of the exchange.
Ordinarily, the prices paid for property in an arm's length exchange is the best evidence of its fair market value. Grill v. United States, 303 F.2d 922, 927 (Ct. Cl. 1962); Augustus E. Staley, 41 B.T.A. at 769. Sales which occur subsequent to the valuation date may furnish evidence as to the value of the property when no events occur between the valuation date and the subsequent sale which significantly affect the value of the property. Philip Kaplan, 43 T.C. 663 (1965); Estate of Fredericka Loewenstein, 17 T.C. 60 (1951); J. E. Lummus, 21 B.T.A. 79 (1930). However, a sale is not indicative of the fair market value of property when it is not comparable. In McEwan v. Commissioner, 241 F.2d 887 (C.A. 2, 1957), affg. per curiam a Memorandum Opinion of this Court, *304 the subsequent sale of all the shares of a closely held corporation was disregarded in valuing a 1.9-percent interest in such corporation 10 years earlier. In Estate of A. Plumer Austin, 10 B.T.A. 1055, 1061 (1928), a battle for control of a bank resulted in the payment of inflated purchase prices in certain transactions - such prices were disregarded in valuing the shares at an earlier date. In Central Trust Company v. United States, 305 F.2d 393 (Ct. Cl. 1962), prior sales of small lots to a limited 15 class of purchasers were found not to be indicative of fair market value. See also Augustus E. Staley, 41 B.T.A. 752 (1940); Robert H. McNeill, 16 B.T.A. 479 (1929).
It is our conclusion that the sale of all the stock of the Scheft and Stone companies to Green Co. was not comparable and was not indicative of the value of the stock purchased by the petitioner. By the exchange of stock, Green Co. acquired complete control of Scheft and Stone companies. As a result of such control, Green Co. could use the Scheft and Stone outlets for its entry into the adult shoe business. By such control, it also could significantly alter *305 the income and expenses of the Scheft and Stone companies - it could eliminate and reduce salaries, and it could make other changes in the operations of the businesses that were intended to bring about economies. In figuring what it would pay for the stock of the Scheft and Stone companies, Green Co. could and did recompute the earnings of the businesses to be acquired, and it used a multiple of 11 to capitalize earnings. Such multiple was in excess of the experience in the industry, and Green Co. was apparently willing to pay that amount because of the advantages which it hoped to derive from the acquisition of the Scheft and Stone businesses. 16 On the other hand, the rights acquired by the petitioner when he purchased the Scheft and Stone stock were quite different. Although both corporations were then earning profits, no dividends were being distributed, none had been, and none could be expected; and as a mere 5-percent stockholder, the petitioner lacked the power to bring about any distribution of dividends. Moreover, with his mere 5 percent of the stock, he lacked the control to effect the economies contemplated by the Green Co. - he lacked the power to increase the *306 earnings of the corporations. Thus, when he acquired the stock, he had no expectation that it would produce income. According to the uncontradicted testimony of both the petitioner and Mr. Scheft, the sale of the companies to Green Co. was not anticipated when the petitioner acquired his stock. As a stockholder, he could hope to realize a gain on the stock if the companies were eventually sold, but there is no evidence indicating that any sale of the companies was then contemplated. In view of the lack of yield on the stock, the petitioner had no reason to contemplate a fortuitous sale of his 5-percent interest, if it had to be sold separately. The right to have the companies repurchase it at book value upon his retirement or death or dismissal would not significantly increase the value of his stock, inasmuch as his retirement would 17 not occur for 10 years and the other events were too speculative. Finally, the amount of the book value provided no significant indication of the fair market value of the stock, since the petitioner totally lacked the power to secure his proportionate share of the book value. Thus, what Green Co. was willing to pay to acquire the businesses *307 of Scheft Co. and Stone Co. has no relationship to what one would pay for the Scheft and Stone stock acquired by the petitioner. Frank J. Kier et al., Executors, 28 B.T.A. 633, 634 (1933).
In the light of the circumstances of this case, we find that the price paid by Green Co. for Scheft and Stone stock is not indicative of the fair market value of the stock acquired by the petitioner. Even though one of the expert witnesses called by the petitioner had been employed by him previously and the other witness was an associate of the first witness, we think that their testimony should not be rejected simply because of such relationships. Since the respondent never questioned the figures as to the earnings and book value of the corporations used by those experts, and since on the record we are unable to find fault with such figures, we accept them as reliable. The methods used by such experts appear to be reasonable. The use of a multiple of 8 for capitalizing earnings was 18 consistent with the practices of the industry, and the discount used by that witness for the nonmarketable character of the petitioner's interest was reasonable. In summary, we find the testimony *308 of such experts to be reasonable and to provide a satisfactory basis for valuing the stock acquired by the petitioner, and we hold that the fair market value of the stock did not exceed the amount paid for it by the petitioner.
Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954. ↩
2. The Stone Co. carried over a net operating loss to the year ended Jan. 31, 1965, which caused it to report no taxable income. The accountant did not testify as to whether he determined the income of the Stone Co. as if no net operating loss carryover existed for such year, nor did he specifically state that he used the earnings after Federal income tax. However, it is apparent from the figures he used and our calculations that he did in fact use the earnings after taxes except that he disregarded the net operating loss carryover. ↩